IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee*,

*v.*

ALLYN AKEEM SMITH,
*Appellant*.

No. CR-18-0295-AP
Filed November 4, 2020

Appeal from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge
No. CR2015-106788-001
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Brunn (Beau) W. Roysden III, Solicitor General, Lacey Stover Gard, Chief Counsel, David R. Cole, Nate Curtisi (Argued), J.D. Nielsen, Vineet Mehta Shaw, Assistant Attorneys General, Capital Litigation Section, Phoenix, Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender, Peg Green, Nicholaus Podsiadlik (argued), Deputy Public Defenders, Phoenix, Attorneys for Allyn Smith

JUSTICE GOULD authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, LOPEZ, BEENE, and JUSTICE PELANDER (Retired)* joined.

JUSTICE GOULD, opinion of the Court:

¶1     Allyn Akeem Smith was sentenced to death after a jury found him guilty of first-degree murder and child abuse.  We have jurisdiction of this automatic appeal pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.  We affirm Smith's convictions and sentences.

## I.

¶2     On December 11, 2014, K.L. was fatally shot by Smith, her former boyfriend and the father of her two-month-old daughter, K.S.[1]  K.L. and K.S. were found on a hiking path near South Mountain in Phoenix.  K.L. was shot in the back of the head, while K.S. was left facedown against the ground with a bullet wound in her thigh.  K.S. survived after surgery.

¶3     Smith and K.L. had a stormy relationship.  Before meeting K.L., Smith was in an on-again-off-again relationship with K. Ward.  At some point in 2014, Ward cheated on Smith and Smith began dating K.L.  Smith and Ward were back together by October of 2014.

¶4     In early 2014, Smith got K.L. pregnant.  Ward obsessed over K.L.'s pregnancy, expressing anger that Smith may have fathered a child with another woman.  Smith tried to convince Ward that he was not the father.  Smith and Ward also had a son, and Ward threatened to leave Smith and take their son away if Smith was indeed the father of K.L.'s child.

¶5     Almost four months before the murder, on August 17, 2014, K.L. and Smith met at Kiwanis Park.  They took a walk through the park, with Smith walking several feet ahead of K.L.  As they were walking, K.L. was assaulted from behind.  At the time, K.L. was seven months pregnant

---

* Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Retired) was designated to sit in this matter.

[1] We view the facts in the light most favorable to sustaining the jury's verdict. *State v. Rushing*, 243 Ariz. 212, 216 n.2 (2017).

with Smith's child, and her assailant kicked her in the stomach, punched her in the back of the head and cheek, knocked her to the ground, and then punched her again. K.L. had to be treated at a hospital.

¶6 Evidence suggested that Smith was involved in the attack. Before the attack, Smith told his friend, G. Curley, that he needed help with a pregnant girl, he needed to "fuck her up" because she was pregnant, and that he was "ready to fuck this bitch up." Curley declined to help, and when Smith later repeated the request, Curley responded that it was "all on him." After the attack, Smith told K.L. he called 911, but there was no record of the call. Because no one was able to identify K.L.'s assailant, no charges were filed. However, Cell Site Location Information ("CSLI") revealed that Smith's long-time friend, R. Marley, was at or within a mile and a half radius of the park when K.L. was attacked. CSLI also revealed that Smith and Marley were together near Smith's apartment immediately after the attack.

¶7 In October 2014, K.L. gave birth to K.S. When K.L. applied for welfare benefits, the Department of Economic Security ("DES") required her to collect child support from K.S.'s father. As a result, on October 27, K.L. named Smith as the father and provided his contact information to DES to set up a DNA test.

¶8 Smith, however, repeatedly failed to show up for his appointments with DES. On December 1, after K.L.'s urging, Smith made an appointment for December 4. He did not, however, show up for that appointment. Smith made another appointment on December 9, but he did not show up for that one either. On December 10, the day before her murder, K.L. persisted in trying to get Smith to take the paternity test, informing him that DES would refer the matter to the courts if he did not show up for his test by December 11. Smith told K.L. that he wanted to meet K.S. and play with her before he took the paternity test. Smith said he would meet with K.L. and K.S. only if they were alone, reiterating, "If anyone else is there, I don't want to come." On December 10, K.L. gave Smith her address, and Smith told her that he would be there at 12:00 or 12:30 p.m. the following day.

¶9 On December 11, at 10:54 a.m., Smith deleted K.L. as a friend on Facebook. Four minutes later, he deleted his OG Triple Facebook account (an account associated with his email address), which he had used to contact K.L. Smith then went to a firearms store and purchased a Phoenix Arms .22 handgun and ammunition. He filled out paperwork and was

captured on store video surveillance at 11:46 a.m. Then, according to Smith's CSLI, he arrived at K.L.'s apartment at approximately 12:16 p.m. Tashae Jones, K.L.'s roommate, saw Smith enter K.L.'s apartment at approximately 12:40 p.m. Smith immediately asked K.L. to have Jones leave the apartment.

¶10 Smith drove K.L. and two-month-old K.S. to a trail near the base of South Mountain, where he fired two shots; one hit K.L. in the back of the head, and another struck K.S. in the thigh. K.L. and K.S. were found around 3:00 p.m. by a hiker. K.L. was unconscious, and K.S. was lying outside her carrier face down on the ground. The paramedic who first treated K.S. had to remove gravel from her mouth. The bullet fractured K.S.'s femur, but she survived after undergoing emergency surgery. Because of K.S.'s small size, she had to be placed in a body cast to treat her fracture.

¶11 K.L. could not be revived, and a medical examiner determined that she died of a gunshot wound to the head. The Phoenix Police Department ("PPD") recovered a shell casing for a .22 caliber weapon from the crime scene.

¶12 After murdering K.L., Smith immediately drove to DES and took a paternity test. He asked an employee what would happen if K.L. did not arrive for testing. He was told that the matter would be closed. The test established that K.S. is his daughter.

¶13 Smith was indicted for first-degree murder and one count of child abuse. On September 13, 2016, the State obtained Smith's CSLI by court order pursuant to A.R.S. § 13-3016. Smith's CSLI revealed that his cell phone was within a mile and a half radius of K.L.'s apartment at 12:16 p.m. and within a mile and a half radius of the crime scene from 1:29 p.m. until 2:04 p.m. Additionally, Smith and Ward had been communicating throughout the morning, but there was a period from 12:28 p.m. to 1:39 p.m. where Smith did not answer Ward's text messages.

¶14 At trial, the jury found Smith guilty of premeditated first-degree murder of K.L. and one count of knowing or intentional child abuse involving threat of death or serious physical injury of K.S. At the end of the aggravation phase, the jury found two aggravators: (1) Smith was convicted of a serious offense (child abuse of K.S.), *see* A.R.S. § 13-751(F)(2); and (2) Smith murdered K.L. for pecuniary gain, *see id.* (F)(5), i.e. to avoid child support payments.

¶15    In the penalty phase, Smith did not testify or exercise his right of allocution but presented twenty-nine non-statutory mitigating circumstances. *Infra* ¶ 160. He presented no statutory mitigators. After considering the mitigation evidence, the jury determined that Smith should be sentenced to death. Additionally, the trial court sentenced Smith to a consecutive presumptive prison term for his child abuse conviction.

## II.

### A.

¶16    Smith argues that the trial court erred in denying his motion to suppress his CSLI. We review a court's factual findings on a motion to suppress for an abuse of discretion "but review de novo the trial court's ultimate legal determination that the search complied with the Fourth Amendment." *State v. Jean*, 243 Ariz. 331, 334 ¶ 9 (2018) (quoting *State v. Gilstrap*, 235 Ariz. 296, 297 ¶ 6 (2014)). Additionally, we review de novo whether the good-faith exception to the exclusionary rule applies. *State v. Weakland*, 246 Ariz. 67, 69 ¶ 5 (2019).

¶17    PPD Detective Helen Balmir prepared an affidavit and applied for a court order ("CSLI Order") to obtain Smith's CSLI through the Initial Appearance Court ("IA Court"). Balmir later testified at the suppression hearing that it was common practice for PPD to make such applications to the IA Court. The IA Court Commissioner granted the order that same day.

¶18    In response to the CSLI Order, AT&T (Smith's service provider) provided "call detail reports," which included Smith's CSLI, subscriber information, historical detail records, and device information from March 1, 2014 through December 14, 2014. AT&T did not disclose any information regarding the content of Smith's communications, such as texts, voicemails, or emails.

¶19    Smith moved to suppress the CSLI, arguing that under *Carpenter v. United States*, 138 S. Ct. 2206, 2220–21 (2018), the State could not obtain his CSLI without a search warrant supported by probable cause. Additionally, Smith claimed that the State violated § 13-3016 by failing to provide him notice of the CSLI Order. Following an evidentiary hearing, the trial court denied Smith's motion, concluding that (1) there was probable cause to support the CSLI Order, and (2) lack of notification under § 13-3016 was not grounds for suppression of Smith's CSLI.

¶20        On appeal, Smith asserts that because the State did not have a warrant and the CSLI Order was only based on reasonable grounds, it did not comply with *Carpenter*, and his CSLI should have been suppressed. Further, Smith argues that § 13-3016(C)(3) is facially unconstitutional to the extent it allows CSLI to be obtained without a warrant.

### 1. Functional Equivalent of a Warrant

¶21        On appeal, the State concedes that under *Carpenter*, a search warrant was required to obtain Smith's CSLI. However, the State argues that because the CSLI Order was the functional equivalent of a warrant, it complied with *Carpenter*. The State bases this argument on the trial court's finding that "regardless of the language used in the order," the order set forth probable cause for the search. *See People v. Edwards*, 97 N.Y.S.3d 418, 421–22 (N.Y. Sup. Ct. 2019). In *Edwards*, the court held that a CSLI order complied with *Carpenter* because it "ma[de] out probable cause," and therefore "the resulting CSLI order [was] the equivalent of a search warrant, even though the issuing court used the lower" reasonable grounds standard. *Id.* at 422; *see also State v. Conner,* 249 Ariz. 121, 248 ¶ 4, 250 ¶¶ 21–22 (App. 2020) (holding that a CSLI order issued under A.R.S. § 13-3017 and 18 U.S.C. § 2703, which requires a showing of "reasonable grounds," substantially complied with the requirements of a search warrant where the trial court expressly found there was "probable cause" supporting the state's application).

¶22        We are not persuaded by the State's argument. Although the CSLI Order cites § 13-3016(C)(1) and (D)(1), which apply to warrants, the IA Court issued an "order," not a search warrant. Further, Balmir stated that she prepared her affidavit as a request for an order, not a warrant. Finally, the CSLI Order is based on a showing of reasonable grounds, not probable cause. Accordingly, we decline to recast the CSLI Order as a warrant.

### 2. Good Faith

¶23        On appeal, the State argues that even if the CSLI Order did not comply with *Carpenter*, the good-faith exception applies because PPD obtained the CSLI Order in good faith reliance on § 13-3016. *See Illinois v. Krull*, 480 U.S. 340, 342, 352 (1987) (applying the good-faith exception where officers "act[ed] in objectively reasonable reliance upon a statute authorizing warrantless administrative searches" where the statute was later found to be unconstitutional (emphasis omitted)); *Davis v. United States*, 564 U.S. 229, 232 (2011) (holding that "searches conducted in

objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule").

¶24 Courts have consistently applied the good-faith exception to CSLI orders issued prior to *Carpenter*. *See, e.g.*, *United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019) (applying the good-faith exception to CSLI obtained under the federal Stored Communications Act ("SCA") where the "[g]overnment had [no] reason to doubt the [law's] constitutionality"); *United States v. Beverly*, 943 F.3d 225, 235 (5th Cir. 2019) (stating that "every one of our sister courts" has "agreed that the good-faith exception—specifically, the *Krull* exception—applies to CSLI obtained under [the SCA] prior to *Carpenter*"); *United States v. Goldstein*, 914 F.3d 200, 204–05 (3d Cir. 2019) (to same effect); *State v. Brown*, 921 N.W.2d 804, 811–12 (Neb. 2019) (to same effect); *Reed v. Commonwealth*, 834 S.E.2d 505, 511 (Va. Ct. App. 2019) (applying the good-faith exception to CSLI obtained under a Virginia statute).

¶25 We conclude that the good-faith exception applies here. Balmir obtained Smith's CSLI pursuant to the IA Court's September 13, 2016 CSLI Order. In applying for the CSLI Order, Balmir reasonably relied on § 13-3016(C), which permitted the state to obtain CSLI without a warrant. Two years later, in June 2018, the Supreme Court decided *Carpenter*. *See* 138 S. Ct. 2206.

¶26 Smith argues, however, that the good-faith exception should not apply because *Riley v. California*, 573 U.S. 373 (2014), was decided before Balmir obtained the CSLI order. As a result, Smith contends that *Riley*'s holding—that a cellphone's "historical location information" deserves greater protection than physical records—should have notified law enforcement that acquiring CSLI without a warrant was unconstitutional. *Id.*

¶27 Smith's reliance on *Riley* is misplaced. *Riley* addressed a warrantless search of the *content* of a cell phone. *Id.* at 379. In contrast, here, Smith's CSLI simply contains records about his general location; there is no content. Additionally, courts have not recognized *Riley* as a barrier to applying the good-faith exception to CSLI obtained without a warrant pre-*Carpenter*. *See, e.g.*, *Korte*, 918 F.3d at 756; *Beverly*, 943 F.3d at 234; *Brown*, 921 N.W.2d at 807.

¶28 Because we apply the good-faith exception, Smith's arguments regarding the more stringent standards for obtaining search

warrants and wiretaps are irrelevant. For example, Smith cites *Berger v. New York*, 388 U.S. 41, 54 (1967), to argue that the CSLI Order was invalid. There, the Supreme Court struck down an eavesdropping statute that allowed a judge to issue a wiretap order based upon reasonable grounds. *Id.* at 54, 60. But the heightened standards for obtaining a wiretap, which involve ongoing surveillance of the content of phone conversations, do not apply to CSLI. Similarly, Smith argues that the CSLI Order did not satisfy the notice requirements for a search warrant. However, since we apply the good-faith exception here, the requirements for a search warrant are not relevant.

### 3. Notice

**¶29** Next, Smith claims that the CSLI Order was invalid because the State did not, as required by § 13-3016(B)(3), provide "prior notice to [Smith]." Smith is wrong for two reasons. First, § 13-3016(D)(1) allows notice to "be delayed for a period of not to exceed ninety days" if the applicant "requests a delay of notification and the court finds that delay is necessary to protect the safety of any person or to prevent flight from prosecution, tampering with evidence, intimidation of witnesses or jeopardizing an investigation." Here, Balmir requested the IA Court delay disclosure of the CSLI Order pursuant to § 13-3016(C)(1), (D)(1) to prevent "jeopardizing" the investigation. The IA Court approved the request, giving the State ninety days to notify Smith.

**¶30** Second, the State timely disclosed the CSLI to Smith. Specifically, in a motion dated November 8, 2016, Smith's counsel admitted that the State disclosed Smith's CSLI on October 18, 2016, which was thirty-five days after the IA Court issued the order and within the ninety days permitted by § 13-3016(D)(1). We recognize that approximately two years later, in his motion to suppress the CSLI and at the suppression hearing, Smith argued that he never received notice. But here, counsel's prior statement constitutes a judicial admission. *State v. Schmid*, 107 Ariz. 191, 193 (1971) (explaining that counsel's statement in a motion for continuance was a judicial admission). And although we typically "consider only the evidence adduced at the suppression hearing," *Jean*, 243 Ariz. at 333 ¶ 2, neither *Jean* nor our other precedent hold that we are bound by inaccurate statements refuted by the record.

**¶31** Smith also argues that there were no grounds for delaying notice. Specifically, he asserts that he could not flee the jurisdiction (he was in custody) and, because the investigation had been ongoing for over a year, providing notification could not have threatened the investigation. We

disagree. Any one of the grounds listed in § 13-3016(D)(1) provides a basis for delaying notification. And here, based on Balmir's affidavit describing PPD's ongoing murder investigation, there was a reasonable basis for the IA Court to conclude that delayed notification was necessary to protect the State's investigation.

### 4. Arizona Constitution

**¶32** Finally, Smith argues that the Arizona Constitution independently requires suppression. Citing *State v. Bolt*, 142 Ariz. 260, 265 (1984), Smith observes that article 2, section 8 was intended to give individuals a sense of security in their "homes and personal possessions." *Bolt* addressed warrantless entry into the home and stated that Arizona's Constitution specifically preserves "the sanctity of homes . . . in creating a right of privacy." *Id.* at 264–65. Thus, Smith argues, because CSLI provides "near perfect surveillance" akin to an ankle monitor, *see Carpenter*, 138 S. Ct. at 2218, CSLI must also implicate the same sense of security in one's home under article 2, section 8.

**¶33** We disagree. Unlike *Bolt*, CSLI does not involve a warrantless entry into a person's home. And here, even if the Arizona Constitution provided greater protection, the good-faith exception applies.

### 5. Due Process

**¶34** Smith argues that the trial court violated his due process rights under the Fourteenth Amendment for two reasons. First, he claims that he was denied the opportunity to oppose the State's application for the CSLI Order. Second, he asserts that his CSLI was obtained in violation of Arizona Rule of Criminal Procedure 15.2(g) and A.R.S. § 13-3016. We review constitutional challenges de novo. *State v. Hidalgo*, 241 Ariz. 543, 548 ¶ 7 (2017).

**¶35** Neither argument is persuasive. "[D]ue process entitles parties to notice and a meaningful opportunity to be heard . . . ." *Id.* ¶ 10. To protect this constitutional guarantee, procedural due process requires that a defendant be provided "an adequate opportunity to fully present factual and legal claims," including the opportunity to respond to evidence submitted against him by the State. *Id.* at 549 ¶ 11 (quoting *Kessen v. Stewart*, 195 Ariz. 488, 492 ¶ 16 (App. 1999)); *State v. Hampton*, 213 Ariz. 167, 179 ¶¶ 48–50 (2006) (to same effect).

**¶36** Citing *State v. Rosengren*, 199 Ariz. 112, 116–17 ¶ 29 (App. 2000), Smith claims that he had a due process right to oppose the State's

application for the CSLI Order. Smith's reliance on *Rosengren* is misplaced. That case, which involved DUI/vehicular manslaughter charges, addressed a defendant's due process right to gather "contemporary, independent exculpatory evidence of sobriety" during the "critical window of availability" after his arrest. *Id.* at 121 ¶¶ 28–29. But here, Smith was provided the CSLI and was given a full and fair opportunity to suppress this evidence at an evidentiary hearing. And, unlike evidence of intoxication, which is fleeting and evanescent, *see id.*, Smith's CSLI was adequately preserved despite its delayed disclosure.

¶37 Smith next argues that the State illegally obtained his CSLI by "ignor[ing] the protections" of Arizona Rule of Criminal Procedure 15.2(g)(1). Relying on *Carpenter v. Superior Court*, 176 Ariz. 486, 488 (App. 1993), and *Wells v. Fell*, 231 Ariz. 525, 528 ¶ 10 (App. 2013), Smith asserts that the State could only obtain his CSLI through a court order issued under Rule 15.2(g)(1), and that it was prohibited from obtaining such information using the procedure set forth in § 13-3016.

¶38 We disagree. Rule 15.2(g) does not, by its terms, provide the exclusive means for obtaining records and information in the possession or control of a third party. Additionally, *Carpenter* and *Wells* do not apply here because they address records within the control of a *party*. *See Carpenter*, 176 Ariz. at 487, 489–90 (requiring a defendant to request police reports under Rule 15.1 because such records were within the control of the State); *Wells*, 231 Ariz. at 526 ¶ 2, 527 ¶ 7, 528 ¶ 10 (providing that under Rule 15.2(g), a court may order disclosure of witness interviews in the possession of defense counsel to the state). Here, Smith did not possess or control his CSLI; this information was in the control and possession of AT&T.

¶39 Finally, Smith argues that the State violated his due process rights by failing to provide notice of the CSLI Order under § 13-3016. However, as noted above, this is inaccurate; the State provided Smith with notice of the CSLI Order. *Supra* ¶ 30.

## 6. Sixth Amendment

¶40 Smith claims that the State violated his Sixth Amendment right to counsel because, when it submitted its request for the CSLI Order, it did not provide notice to his attorney. As a result, he asserts that his attorney was denied the opportunity to oppose the State's request. We review constitutional issues de novo. *Hidalgo*, 241 Ariz. at 548 ¶ 7. Because Smith did not raise this argument in the trial court, we review for fundamental error. *State v. Escalante*, 245 Ariz. 135, 138 ¶ 1 (2018).

**¶41** There was no error, much less fundamental error. Smith's Sixth Amendment right to counsel was satisfied because his attorney was (1) provided copies of the CSLI and (2) had an opportunity to suppress this evidence at an evidentiary hearing.

**¶42** Additionally, Smith's reliance on *State v. Groshong*, 175 Ariz. 67, 71 (App. 1993), is misplaced. There, the State filed a motion to obtain the defendant's medical records after defense counsel asserted the records were protected by the physician-patient privilege (A.R.S. § 13-4062(4)). *Id.* While the discovery dispute was pending, the State inadvertently applied for and obtained the privileged records through a warrant. *Id.* The court of appeals affirmed the trial court's order suppressing the records, noting that under the specific circumstances of the case, the State's obtaining the records through a warrant, although inadvertent, interfered with the defendant's right to counsel. *Id.*

**¶43** Here, unlike in *Groshong*, the State did not attempt to circumvent a court order or a defendant's assertion of privilege; it used lawful means to obtain non-privileged records from a third party. Additionally, Smith's counsel was not restricted from challenging the admissibility of his CSLI, and there is no evidence that the thirty-five-day delayed notice impacted his representation. *See United States v. Morrison*, 449 U.S. 361, 363 (2000) (finding that a hypothetical error did not impact the proceedings when it did not interfere with the "quality or effectiveness of [the] legal representation").

B.

**¶44** Smith argues that the trial court violated the Due Process Clause of the Fourteenth Amendment by admitting Jones's pretrial identification of Smith because it was unduly suggestive and unreliable. This Court "review[s] the reliability and fairness of a challenged identification for abuse of discretion." *State v. Goudeau*, 239 Ariz. 421, 451 ¶ 103 (2016). But it "review[s] de novo the 'ultimate question' of the constitutionality of a pretrial identification." *Id.* (quoting *State v. Garcia*, 224 Ariz. 1, 7–8 ¶ 6 (2010)).

**¶45** After Detective Udd learned that Smith was K.S.'s father, he obtained an MVD photograph of Smith. The day after the murder, Udd took the photograph to visit Jones, K.L.'s roommate. Udd showed Jones the photograph of Smith, asking her if she recognized the person in the photograph. Jones replied, "That's the baby's daddy." Jones also told Udd that K.L. had shown her pictures of Smith on Facebook and had identified him to her as K.S.'s father. Additionally, Jones said that Smith was at the

apartment the day of the murder. The interview, which was recorded, was played at a subsequent *Dessureault*[2] hearing.

**¶46**        During the *Dessureault* hearing, Jones testified that she viewed Smith for multiple minutes in a bright room, wanted to see what he looked like, focused on him, and could clearly see his face. Jones also testified that she was "very sure" Smith was at the apartment. Udd later testified that Jones was "100 percent" sure when she identified Smith.

**¶47**        The trial court found that although showing Jones just one picture was "inherently suggestive," the identification was admissible because it was reliable. During trial, the court properly instructed the jury on determining whether Jones's identification was reliable. *See* Rev. Ariz. Jury Instr. ("RAJI") (Crim.) Standard Instruction 39, at 32 (3d ed. 2016).

**¶48**        Due process requires that pretrial identification procedures be conducted in a manner that is "fundamentally fair and secures the suspect's right to a fair trial." *State v. Lehr*, 201 Ariz. 509, 520 ¶ 46 (2002). In *Dessureault*, we set forth the procedure for Arizona courts to follow when a defendant challenges a pretrial identification. 104 Ariz. at 383–84. The identification must not be the product of an "inherently suggestive" procedure or, if the procedure was inherently suggestive, it must be reliable. *State v. Rojo-Valenzuela*, 237 Ariz. 448, 450 ¶ 7 (2015); *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (concluding that "reliability is the linchpin in determining the admissibility of identification testimony").

**¶49**        The State concedes that the use of a single photograph was inherently suggestive. *State v. (Johnny) Williams*, 144 Ariz. 433, 439 (1985); *see Manson*, 432 U.S. at 99, 106 (considering reliability of an identification where a single photograph lineup was "suggestive and unnecessary").

**¶50**        Thus, we must determine whether Jones's identification was reliable. In making this determination, courts apply several factors, including: (1) the witness's opportunity "to view the criminal at the time of the crime"; (2) the "witness' degree of attention"; (3) the "accuracy of the witness' prior description of the criminal"; (4) the witness's "level of certainty" at the initial viewing; and (5) the "length of time between the crime" and the witness's identification of the defendant. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). The witness's identification must exhibit sufficient

---

[2] *State v. Dessureault*, 104 Ariz. 380 (1969).

indicia of reliability under the totality of the circumstances. *Rojo-Valenzuela*, 237 Ariz. at 451 ¶ 11.

¶51        For the reasons discussed below, we conclude that based on the totality of the circumstances, the record supports the trial court's determination that Jones's identification of Smith was reliable.

## 1. Opportunity to View the Suspect

¶52        The record supports the trial court's finding of reliability under the first factor. A few minutes is enough time to view a suspect. *State v. Ware*, 113 Ariz. 337, 339 (1976) (determining that the first factor weighed in favor of reliability where the witness "observed the suspect face to face in the well-lighted store for approximately three minutes"); *State v. (Bernard) Smith*, 146 Ariz. 491, 497 (1985) (determining that the witness viewing the suspect walk across a parking lot weighed in favor of reliability). *But see State v. Schilleman*, 125 Ariz. 294, 296 (1980) (finding ten seconds insufficient); *State v. (Ronald T.) Williams*, 166 Ariz. 132, 137 (1987) (finding approximately five seconds insufficient).

¶53        Jones said she viewed Smith for "[m]aybe about–not even ten minutes. He walked in my house, he had on black gloves. He saw me, went in the bathroom." A few questions later, however, Jones testified that she viewed him for about two minutes. Either amount of time is sufficient. At trial, Jones testified that she saw Smith for "maybe not even five minutes." She also testified that Smith walked out "really fast" from the bathroom, but when she later left the apartment, she noticed he was standing by the stairs and she could "see his face." She said the lights were on and the apartment was "bright," and she could "clearly" see everything in the living room. She also recognized him from Facebook.

¶54        Although Jones also stated she "didn't really—I mean, he wasn't really—like, I didn't see him because he went into the bathroom so fast so—" most of her statements express that she was able to see him. When she was able to see Smith, she tried to look at him the entire time and saw him clearly.

## 2. Degree of Attention on Smith

¶55        The record also supports the trial court's finding under the second factor. Jones's attention was directed at Smith when he was in the apartment. *See (Bernard) Smith*, 146 Ariz. at 497 (finding the second factor weighed in favor of reliability where the witness testified that she was "able to fix her full attention on [the] defendant"). Jones also testified that she

"wanted to see what he looked like" and was "trying to focus [her] attention on him" "the entire time." Although she said she was "not really" curious about him, she also said she "want[ed] to meet him."

¶56 Smith argues, however, that Jones did not pay attention to him because she could not describe his clothing or appearance. This is not entirely accurate. Jones was able to describe some of Smith's clothing (he was wearing tight black gloves) as well as his general appearance (he was "tall, light skinned," and "maybe African-American"). Although her inability to recall more details certainly lessens the weight of this factor, we conclude that substantial evidence supports the trial court's finding.

### 3. Prior Description

¶57 Under the third factor, the court must consider the accuracy of a witness's description before the unduly suggestive procedure. *Biggers*, 409 U.S. at 199. But here, Jones never provided a description of Smith before Udd showed her the photo. As a result, this factor weighs against a finding of reliability. *But see* (*Johnny*) *Williams*, 144 Ariz. at 440 (determining that a suggestive identification was reliable even though witness had given no prior description of the perpetrator).

### 4. Level of Certainty

¶58 The record also supports the trial court's finding under the fourth factor. Jones was confident when she identified Smith. *See State v. Alvarez*, 145 Ariz. 370, 372 (1985) (determining that level of certainty favored admission where the witness responded "immediately and without hesitation"); *State v.* (*Joe*) *Williams*, 113 Ariz. 14, 18 (1976) (stating that identification was reliable in part because the witness testified that "she was sure" about the identification); *State v. Taylor*, 109 Ariz. 518, 520 (1973) (to same effect).

¶59 Udd testified that Jones was "100 percent" sure, "seemed confident," and never hesitated. Jones testified that after looking at his photo she was "very sure" Smith was at the apartment. Additionally, at the hearing, the court played Jones's interview. In the interview Udd stated, "I showed you a photograph and you identified an individual. Is that the same individual that came over yesterday?" Jones responded, "I believe so."

¶60        Smith argues that this factor weighs against reliability.  To support his claim, he notes that when the State asked Jones, "When you saw [Smith], did you recognize him?" she replied, "no." But Smith ignores the fact that the State clarified Jones's response with its next question. Specifically, the State asked Jones whether Smith "look[ed] like anybody you had seen a photograph of before?" Jones then responded that she had seen him before in K.L.'s Facebook pictures.  In short, Jones's testimony, when examined as a whole and in context, supports the court's finding that Jones was certain.  And although Smith criticizes the certainty factor as empirically unreliable, Arizona courts have consistently given weight to this factor.  *See, e.g.*, *State v. Moore*, 222 Ariz. 1, 9 ¶ 27 (2009) (considering witness's level of certainty); *Alvarez*, 145 Ariz. at 372 (same).

### 5. Length of Time

¶61        Finally, because Jones identified Smith the day after seeing him, the fifth factor also weighs in favor of admitting her identification.  *See Taylor*, 109 Ariz. at 520 (finding reliability where "there was only a lapse of seven days between the time of the attack and the confrontation").

### C.

¶62        Smith argues that the trial court erred in denying his *Batson* challenges to the State's peremptory strikes of Jurors 14 and 211.  *Batson v. Kentucky*, 476 U.S. 79 (1986).  These jurors were the only African Americans on the prospective jury panel.  "We defer to the trial court's ruling, which is based 'largely upon an assessment of the prosecutor's credibility.'" *Garcia*, 224 Ariz. at 10 ¶ 22 (quoting *State v. Roque*, 213 Ariz. 193, 203 ¶ 12 (2006)).  We will not reverse a trial court's ruling on a *Batson* challenge unless it is clearly erroneous.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

¶63        The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  In *Batson*, the Supreme Court held that prohibiting an individual from serving on a jury based on race violates the Equal Protection Clause.  476 U.S. at 89.  "A *Batson* challenge involves three steps: (1) The defendant must make a prima facie showing of discrimination, (2) the prosecutor must offer a race-neutral reason for each strike, and (3) the trial court must determine whether the [defendant] proved purposeful racial discrimination."  *State v. Medina*, 232 Ariz. 391, 404 ¶ 44 (2013) (quoting *State v. Hardy*, 230 Ariz. 281, 285 ¶ 12 (2012)).

¶64 Here, by asking the State to provide race neutral-reasons, the trial court implicitly found that Smith made a prima facie showing of discrimination. *See id.* ¶ 45. Thus, under *Batson*'s second step, the prosecutor explained that Juror 14 was hesitant about imposing the death penalty, stating that he "had to do a lot of soul searching" and that he "couldn't make a decision" and "did not want that weight" of imposing the death penalty. The State then claimed it struck Juror 211 because she had two surgery follow-up appointments that conflicted with the trial schedule. The prosecutor also noted that Juror 211 suffered from migraines and took daily medication.

¶65 After listening to the State's reasons for striking the jurors, the court stated:

> All right. The *Batson* motions are denied. I find that the State has made race-neutral reasons for striking them. I remember juror 14 very clearly being very hesitant about being able to serve on this. We talked to him for some period of time. And I believe we spoke to him privately. 211 there were race-neutral reasons given. She does have hardships with regard to her health, at least to a certain degree. So I find that the *Batson* challenges shall be denied.

¶66 The trial court correctly concluded that the State offered race-neutral reasons for striking both jurors. The State struck Juror 14 based on his reluctance to impose the death penalty. *See State v. Escalante-Orozco*, 241 Ariz. 254, 271 ¶ 36 (2017) (explaining that potential reluctance to impose the death penalty was a race-neutral reason), *abrogated on other grounds by Escalante*, 245 Ariz. 135; *State v. Bolton*, 182 Ariz. 290, 302 (1995) (determining that prosecutors may strike jurors "who have expressed reservations about capital punishment" even if they are "not excludable for cause"). Additionally, the State explained it struck Juror 211 because she had health problems and the trial schedule conflicted with her surgery follow-up appointments. *See State v. Gay*, 214 Ariz. 214, 220–21 ¶¶ 18–19 (App. 2007) (holding that State's explanation for striking an African American juror, which was based in part on the State's concern that "she would be distracted by upcoming medical tests" was a race-neutral reason).

¶67 Under *Batson*'s third step, the court "must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019); *Hardy*, 230 Ariz. at 285 ¶ 12 (explaining that under *Batson*'s third step the court evaluates the striking party's credibility, as well as the demeanor

of the striking attorney and the excluded juror). If the strike is based on the juror's demeanor, such as nervousness or inattention, the trial court must also evaluate whether the juror's "demeanor can credibly be said to have exhibited the basis for the strike." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Smith bears the burden of proving purposeful discrimination, and we will not reverse "unless the reasons provided by the State are clearly pretextual." *Roque*, 213 Ariz. at 204 ¶ 15, *abrogated on other grounds by Escalante-Orozco*, 241 Ariz. 254.

¶68        The record supports the trial court's conclusion that the strikes were not pretextual. In denying Smith's *Batson* challenge as to Juror 14, the court stated that "we talked to him for some period of time," and observed that he was "very hesitant" about serving on the jury. Indeed, Juror 14 made it clear throughout jury selection that he was extremely reluctant to serve on a death penalty case. He explained that he would "have to do some soul searching" about imposing the death penalty and didn't know if he wanted a death sentence on his conscience. He also stated that it would be "difficult" for him to "deci[de] . . . life or death" and he questioned whether he "should . . . be the one really making [the] decision." He agreed with the State that he should not be empaneled on the jury because of this issue and expressed that he may become "frozen and unable to make that decision." Later, Juror 14 spoke privately with the court and reiterated that he would have difficulty imposing a death sentence and would consider it a "last option." *See State v. Newell*, 212 Ariz. 389, 401–02 ¶¶ 55, 58 (2006) (affirming denial of *Batson* challenge where juror provided conflicting responses about the death penalty).

¶69        Similarly, the trial court did not err in denying Smith's *Batson* challenge as to Juror 211. The court concluded that the State struck Juror 211 based on "hardships with respect to her health." Specifically, during voir dire and in her written questionnaire, Juror 211 advised the court that she suffered from migraines, and that serving on the jury would create an "undue hardship" because she had two surgery follow-up appointments that conflicted with the trial schedule and could not be rescheduled.

¶70        Smith asserts that Juror 211 later advised the court that she could reschedule her surgical appointments. We disagree. It is unclear from the record whether Juror 211 was referring to rescheduling "four appointments" that she had for "injections" (appointments she consistently stated could be rescheduled) or her surgery follow-up appointments. Although the record is less than clear as to which appointments could be

rescheduled, the trial court did not abuse its discretion in determining that Juror 211's medical hardships were the basis for the State's strike.

¶71        Smith argues this Court, for the first time on appeal, must conduct a comparative analysis of Jurors 14 and 211 vis-à-vis other jurors whom the State did not strike.  We disagree.  Because Smith did not raise this issue in the trial court, it is waived.  *See Foster v. Chatman*, 136 S. Ct. 1737, 1749–50 (2016) (acknowledging that it made an "independent examination of the record," but not requiring a comparative analysis where it was not raised before the trial court); *Snyder*, 552 U.S. at 483 ("[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial."); *Medina*, 232 Ariz. at 404–05 ¶¶ 48–49 (finding comparative analysis not required where defendant did not raise it before the trial court); *Escalante-Orozco*, 241 Ariz. at 272 ¶ 37 (same).  And although *Flowers* explained that a comparative analysis may be relevant in addressing a *Batson* challenge, it did not require such an analysis for the first time on appeal.  139 S. Ct. at 2247–49; *see State v. Curry*, 447 P.3d 7, 11 (Or. Ct. App. 2019) (explaining that assessment under *Flowers* should include a comparative juror analysis "when the record is adequate to do so").

¶72        Citing *United States v. You*, Smith also argues that the trial court erred by failing to make specific findings regarding the "prosecutor's credibility," as well as the court's "reason[s] for accepting" the State's race-neutral explanations.  Addressing a *Batson* challenge, *You* held that a trial court cannot simply deem a race-neutral explanation "plausible," but must make a "clear record" and "deliberate decision" as to whether there was purposeful discrimination.  382 F.3d at 968 n.2, 969 (quoting *United States v. Alanis*, 335 F.3d 965, 967 (9th Cir. 2003)).

¶73        Smith's argument is not persuasive.  Unlike *You*, the trial court here did more than simply deem the State's explanations "plausible." Rather, the court made specific findings as to each juror, stating that "Juror 14 [was] very clearly being very hesitant about being able to serve," and Juror 211 had "hardships with regard to her health."  Moreover, our precedent allows us to defer to an "implicit finding" that a "reason . . . was non-discriminatory" even when "the trial court did not expressly rule on [the third *Batson* factor]."  *State v. Prasertphong*, 206 Ariz. 70, 87 ¶¶ 63–64, *supplemented*, 206 Ariz. 167 (2003); *State v. Canez*, 202 Ariz. 133, 147 ¶ 28 (2002) (affirming the court's "implicit[] finding" under step three in

denying the *Batson* challenge), *abrogated on other grounds by State v. Valenzuela*, 239 Ariz. 299 (2016).[3]

**¶74** Accordingly, we affirm the trial court's order denying Smith's *Batson* challenges.

D.

**¶75** At trial, the court admitted a PowerPoint and video demonstrating the location and movement of Smith's and K.L.'s cellphones on the day of the murder. Smith argues that the video was misleading because (1) CSLI can only show the general location of a cell phone (within one and a half miles of a cell tower) and (2) it cannot track the specific path a cell phone travels between cell towers. Thus, Smith argues that the trial court erred by admitting the video.

**¶76** We review evidentiary rulings for an abuse of discretion. *State v. (Joe C.) Smith*, 215 Ariz. 221, 232 ¶ 48 (2007). Relevant evidence may be excluded "if its probative value is substantially outweighed" by a danger of misleading or confusing the jury. Ariz. R. Evid. 403. Additionally, "[t]he trial court has discretion to determine whether the probative value of evidence is outweighed by the danger of unfair prejudice or confusion of the issues; we will not disturb a trial court decision unless the court has clearly abused its discretion." *State v. Mauro*, 159 Ariz. 186, 199 (1988).

**¶77** Inaccuracies in a video go to the weight of the evidence, not its admissibility, and may be clarified through witness testimony. *See State v. Steinle*, 239 Ariz. 415, 419 ¶ 15 (2016) (explaining that a video may be misleading, but "[s]uch dangers" may be "mitigated by testimony" or "cautionary instructions"); *State v. Doerr*, 193 Ariz. 56, 66 ¶¶ 46–48 (1998) (holding that the State's maps and diagrams of the crime scene were admissible even if not "absolutely correct," so long as they allowed the jury "to understand better the statements of the witness" and the inaccuracies

---

[3] The court of appeals recently issued an opinion that the State contends does not follow our precedent on this issue. *See State v. Porter*, 248 Ariz. 392, 394 ¶ 1, 399 ¶ 20 (App. 2020) (holding that a trial court must expressly determine "that the racially disproportionate impact" of strikes is "justified by *genuine*, not pretextual, race-neutral reasons" whenever there is a pattern of strikes against minority jurors). The State's petition for review in *Porter* is currently pending before this Court, and we express no opinion on that case here.

were clarified by witness testimony (quoting *Young Mines Co. v. Blackburn*, 22 Ariz. 199, 207 (1921))).

¶78 Here, any inaccuracies in the video were clarified by Balmir's testimony. On at least sixteen occasions, Balmir testified that the video could not portray the path or exact locations of the phones. For example, she stated that the video did not "demonstrate the exact route that someone may have taken" and was "absolutely not a representation of how [the individuals] travel or which route they took." The jury was also advised that CSLI does not provide the precise location of a cell phone, but rather tracks its location anywhere within a mile and a half radius of the nearest tower. The court, therefore, did not abuse its discretion.

¶79 Smith argues for the first time on appeal that the video was unfairly prejudicial because it showed K.L.'s phone fade away after her death. Specifically, after the time of K.L.'s death, the video shows a small circle surrounding her cell phone slowly fading away.

¶80 We find no error, much less fundamental error. Even if the depiction in the video suggests K.L.'s death, Smith does not explain how he was prejudiced. No one disputes that K.L. did, in fact, die near the location of her cell phone, and there is nothing about the "fading circle" that is unduly prejudicial or inflammatory.

¶81 Finally, Smith argues that the court abused its discretion by admitting the video without watching it. The court, however, viewed essentially the same material in the PowerPoint. And, based on Smith's objections, the court was apprised of the inaccuracies in the video. Although it would have been better practice to view the video in its entirety, the trial court did not abuse its discretion.

E.

¶82 Smith argues the trial court violated the Confrontation Clause by restricting his cross-examination of the State's former case agent, Detective Udd. "We review limitations on the scope of cross-examination for abuse of discretion." *State v. Delahanty*, 226 Ariz. 502, 506 ¶ 17 (2011).

¶83 PPD investigated former case agent Detective Udd's timekeeping practices from October 2015 through October 2016. PPD ultimately determined that Udd had logged ninety-six hours of unaccounted-for work time. Udd was demoted and PPD recommended he

be charged with theft, a class three felony. But on September 1, 2017, the Maricopa County Attorney's Office ("MCAO") declined to charge Udd.

¶84        Before trial, Smith filed a motion in limine asking the court to allow him to question Udd about the circumstances of his demotion. Smith did not, however, request permission to ask Udd about MCAO's charging decision.[4] The trial court granted Smith's motion in part, allowing him to question Udd about his unaccounted-for hours, PPD's inquiry into his hours, and his retirement. In its ruling, the court further stated that Udd could not be questioned about "the county attorney's office not charging him."

¶85        Smith now claims that Udd might have been motivated to testify unfavorably against him based on MCAO's charging decision. He argues that Udd "had every incentive to prove his value to the prosecution," suggesting that Udd testified against him to avoid being charged.

¶86        "The right to cross-examination must be kept within 'reasonable' bounds and the trial court has discretion to curtail its scope." *State v. Fleming*, 117 Ariz. 122, 125 (1977). "The test is whether the defendant has been denied the opportunity of presenting to the trier of fact information which bears either on the issues in the case or on the credibility of the witness." *Id.* Although a court cannot prohibit all questioning bearing on a witness's credibility, courts retain "wide latitude" to reasonably limit cross-examination based on, "among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

¶87        We find no Confrontation Clause violation. As an initial matter, the trial court gave Smith broad latitude in impeaching Udd's credibility. Specifically, the court allowed Smith to question Udd about several matters related to the PPD investigation, including his theft of time. *State v. Adams*, 155 Ariz. 117, 121–22 (App. 1987) (finding no Confrontation

---

[4] Smith now claims that the State raised the issue of whether MCAO's charging decision was admissible for impeachment purposes. The record does not support this contention. Nevertheless, because we find no error, much less fundamental error, whether this claim was preserved for our review does not affect our decision.

Clause violation in part because the defendant was able to attack the witness's credibility on several matters).

¶88 Further, Smith had no good-faith basis to support his claim that Udd altered his testimony in return for leniency from the State. Rather, he simply speculates that the State may have tried to elicit favorable testimony from Udd in exchange for leniency. Such speculation, however, does not give rise to a Confrontation Clause violation. *See State v. McElyea*, 130 Ariz. 185, 186–87 (1981) (finding no Confrontation Clause violation where defendant sought to question a witness about a subsequent criminal charge not subject to any plea agreement because there was no evidence it would have revealed that the witness had a bias or interest in testifying against a former codefendant); *Fleming*, 117 Ariz. at 126 (finding no abuse of discretion where the defendant could not show that further cross-examination regarding a witness's brief stay in a mental hospital four years prior bore on his credibility where there was no indication that the witness continued to have mental problems); *State v. Abdi*, 226 Ariz. 361, 366–67 ¶ 22–23 (App. 2011) (finding no violation in part because the record contained no evidence supporting the defendant's theory that a witness was motivated to lie).

¶89 Relying on *State v. Little*, Smith argues he had a right to cross-examine Udd to see what facts "might develop." 87 Ariz. 295, 301 (1960). We are unpersuaded. *Little* did not address what kind of proof, if any, was submitted to support the defendant's attack on the witness's credibility. *Id.* Rather, the court simply stated that the offer of proof was within "the range of permissible cross-examination." *Id.* Here, Smith gave no offer of proof that Udd agreed to testify against Smith in return for leniency from the State. *See State v. Cadena*, 9 Ariz. App. 369, 371 (1969) (finding reversible error where a defendant attached an offer of proof—that the officer was facing a departmental inquiry after a fatal shooting occurred during his investigation—with his request to question the officer to show that he was motivated to secure a conviction against the defendant).

¶90 Finally, Smith has failed to show that he suffered prejudice. He argues that the "entire case relied on the jury's faith in Udd's investigation" and impeaching Udd would have shown he had "every incentive to prove his value to the prosecution." We disagree. Based on the evidence presented at trial, Udd's credibility was not a central issue in this case. *Cf. State v. Glissendorf*, 235 Ariz. 147, 149 ¶ 2, 152 ¶ 19 (2014) (explaining that a defendant was prejudiced by destruction of recordings that could have been used to impeach the State's only witness in a child

molestation case). Rather, Udd testified about photos, video footage, CSLI, documents, texts, and Facebook messages he gathered during his investigation almost three years before MCAO's charging decision. Further, there is no evidence that Udd altered these exhibits to ensure a conviction, nor is there any evidence that the investigation was tainted by MCAO's charging decision. *See State v. Carreon*, 210 Ariz. 54, 63 ¶ 37, *supplemented*, 211 Ariz. 32 (2005) (finding no Confrontation Clause violation and explaining that unrelated information sought through cross-examination could have confused the jury).

¶91 Therefore, given the trial court's wide latitude to limit the scope of cross-examination on issues regarding a witness's bias, *see Van Arsdall*, 475 U.S. at 679, we conclude there was no error.

F.

¶92 Smith argues that the trial court erred by failing to reinstruct the jury at the end of the aggravation phase in violation of Smith's right to a fair trial under the Due Process Clause. Because Smith did not object, we review this claim for fundamental error. *Escalante*, 245 Ariz. at 138 ¶ 1.

¶93 At the beginning of the aggravation phase, the court read the final aggravation phase instructions to the jury. Following the instructions, counsel presented arguments highlighting the evidence that was already presented during the guilt phase. At the conclusion of the arguments, the judge did not reinstruct the jurors, but simply reminded them that their verdict had to be unanimous, the admonition was still in effect, and told them to take their copies of the jury instructions with them to deliberate. The entire aggravation phase, including instructions, lasted less than fifty minutes.

¶94 Arizona Rule of Criminal Procedure 19.1(a)(1),(b), which "generally applies to all trials," states that a court should instruct the jury after the presentation of evidence and closing arguments "unless the court directs otherwise." The comment to Rule 19.1 provides "[t]he court has discretion to give final instructions to the jury before closing arguments of counsel instead of after." Ariz. R. Crim. P. 19.1 cmt; *see State v. Nieto*, 186 Ariz. 449, 457 (App. 1996) (finding no error or prejudice where the court gave final jury instructions before closing arguments under Rule 19.1).

¶95 In contrast, Rule 19.1(d), which specifically applies to the "aggravation phase" of a capital case, does not expressly state that the court

may "direct otherwise" with respect to the order of the trial. Rather, Rules 19.1(d) (4), (7)–(8) provide that during the aggravation phase, the State must first offer evidence in support of each aggravator, and the court must instruct the jury after the parties "present arguments." In short, Rule 19.1(d), by its terms, indicates that the trial judge has less discretion to change the order of the trial during the aggravation phase than the guilt phase. As a result, we conclude that the trial court did not comply with Rule 19.1(d)(7)–(8) by instructing the jury at the beginning of the aggravation phase.

¶96 Nevertheless, even assuming the error was fundamental, Smith has not shown prejudice. *State v. Kinkade*, 140 Ariz. 91, 94–95 (1984) (finding no fundamental error where the court instructed the jury on reasonable doubt before the guilt phase, the court referred the jury to their copy of the instructions, and the attorneys reiterated the standard in their closing arguments); *see State v. Jackson*, 144 Ariz. 53, 55 (1985) (declining to reverse even under a harmless error standard where the failure to instruct at the end of the trial did not influence the verdict). Here, the trial court read the final instructions to the jury less than fifty minutes before they recessed to deliberate, referenced the instructions at the end of the aggravation phase, and provided the jury with written copies of the instructions.

¶97 Smith's reliance on *State v.* (*Carl D*.) *Johnson*, 173 Ariz. 274 (1992), is misplaced. There, the jury listened to a full day of evidence after the court read the instructions. *Id.* at 276. Here, the entire aggravation phase lasted less than fifty minutes. And unlike (*Carl D*.) *Johnson*, where the trial court gave an improper reasonable doubt instruction that shifted the burden of proof to the defendant, here it is undisputed that the trial court's instructions were proper. *Id.*

¶98 Therefore, even if the court erred by failing to reinstruct the jury at the close of the aggravation phase, it was not fundamental error.

G.

¶99 Smith argues there is insufficient evidence to show that he committed the murder "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." § 13-751(F)(5) (2012). We will uphold the jury's verdict if it is supported by substantial evidence, and we "view[] the evidence in the light most favorable to sustaining the jury

verdict." *State v. Gunches*, 225 Ariz. 22, 25 ¶¶ 13–14 (2010) (quoting *Roque*, 213 Ariz. at 218 ¶ 93).

**¶100** Pecuniary gain does not have to be the defendant's only motive for a murder. *See State v. Acuna Valenzuela*, 245 Ariz. 197, 212 ¶ 42 (2018) (stating that "pecuniary gain need not be the only motive for the (F)(5) aggravator to apply"); *State v. Martinez*, 218 Ariz. 421, 435 ¶ 66 (2008) ("Pecuniary gain . . . need only be *a* motive for the murder, not the sole motive."). Additionally, pecuniary gain may be proved by direct or circumstantial evidence. *State v. Rose*, 231 Ariz. 500, 515 ¶ 73, 516 ¶ 75 (2013); *see also Walker v. State*, 707 So. 2d 300, 304–05, 317 (Fla. 1997) (providing that substantial evidence supported pecuniary gain aggravator where the State showed that the defendant, who was convicted of murdering the victim, encouraged her to have an abortion before the murder, expressed concerns over paying child support, and admitted he was arguing with the victim before he killed her); *People v. Carasi*, 190 P.3d 616, 648 (Cal. 2008) (holding that the jury could reasonably "conclude that defendant sought to benefit financially" from the victim's death by eliminating his monthly child support obligation, given the fact defendant had limited financial resources and he "perceived his child support obligation to [the victim] as a tremendous burden, calling her a 'bitch' and 'whore' who deserved to die, and saying that his financial future would be 'fucked' if nothing changed").

**¶101** Here, there was substantial circumstantial evidence showing that Smith murdered K.L. to avoid paying child support for K.S. The assault on K.L. at Kiwanis Park strongly suggests that Smith tried to end her pregnancy. *Supra* ¶¶ 5–6. Additionally, throughout the DES proceedings, Smith engaged in a course of conduct, as well as made several statements, showing that he did not want to pay child support to K.L.

**¶102** During the child support proceedings, Smith made several statements to K.L. showing that he was focused on what his financial obligations would be if the paternity tests determined he was K.S.'s father. For example, on November 13, Smith contacted K.L. on Facebook and said, "We need to do a legal DNA test so we can get this situation handled. Since you need diapers and wipes *and money*, we need to do a DNA test through the courts to establish paternity legally because I'm done with all this drama." (emphasis added). Smith also expressed his frustration with K.L.'s efforts to establish paternity so that she could collect support. On December 10, the day before the murder, Smith stated, "I know you only care because your benefits will get cut off without the test," and said, "If you don't want

me to see the baby and you just want *money* then let me know." (emphasis added).

¶103        Smith also failed to appear for a paternity test, effectively blocking K.L.'s efforts to collect support.[5] As a result, on December 10, the day before the murder, K.L. brought the issue to a head. She told Smith to "stop talking to me and take your DNA test," and warned that he "ha[d] till tomorrow till [a DES worker] sends everything off to the courts." When Smith said he would come at noon on December 11, K.L. pressed him and asked why he could not come sooner and said "Don't say you coming tomorrow then don't come. Don't tell me you are going to take the test and then don't show." She also asked if she could drive with him to the DES testing site, indicating she wanted to make sure that Smith appeared.

¶104        Smith knew that on December 11 he could no longer avoid paternity testing. As a result, substantial evidence demonstrates he murdered K.L. that day. Then, immediately after the murder, he drove to DES and submitted to DNA testing. Upon his arrival, Smith asked a DES employee what would happen if K.L. did not show up for her DNA test. He was told the matter would be closed. Smith secretly recorded the conversation on his cell phone, indicating he wanted to preserve a record of this statement.

¶105        Smith argues, however, that there is insufficient evidence to prove the pecuniary gain aggravator because the evidence showed that (1) he was uncertain about whether he was the father of K.S., and (2) as a legal

---

[5] Defense counsel claimed at oral argument in this Court that Smith appeared for his December 4 appointment and suggested that he was sent away by DES for some reason, perhaps because he had a minor child with him. This argument was never raised in Smith's briefs and is therefore waived. Moreover, the record shows that Smith either never arrived for the appointment or voluntarily left without providing a DNA sample. Kathy McGill, a DES caseworker, testified that although the DES file contained a code indicating that the "noncustodial parent" "showed for genetic tests," there was no record that Smith signed the sign-in sheet on December 4. McGill also testified that in her experience, a DES employee would not turn away a person who showed up for DNA testing. Additionally, McGill stated that when Smith missed his appointment, she called him to reschedule. When Smith finally returned her call on December 8, he never told her that he made the December 4 appointment.

matter, despite the death of K.L., as long as K.S. was alive he might have still been responsible for child support. We disagree.

**¶106** Based on the Kiwanis Park incident, as well as Smith's statements and behavior throughout the DES proceedings, the jury could well conclude that Smith knew he was the father of K.S. Additionally, the evidence supports the conclusion that Smith—even if he was legally mistaken—had an expectation that he could avoid paying child support if he murdered K.L. Indeed, on the day of the murder, the DES worker confirmed this expectation. In short, because § 13-751(F)(5)[6] only requires evidence of an *expectation* of pecuniary gain, it is irrelevant whether Smith's actions, as a matter of law, released him from paying child support. *See Carasi*, 190 P.3d at 647–48 (stating pecuniary gain aggravator did not require proof that the defendant "experience[d] any actual pecuniary benefit"); *People v. Edelbacher*, 766 P.2d 1, 26 (Cal. 1989) (rejecting a similar argument and reasoning that "[p]roof of actual pecuniary benefit" is unnecessary because "the relevant inquiry is whether the defendant committed the murder in the expectation" of financial gain (quoting *People v. Howard*, 749 P.2d 279, 298 (Cal. 1988))).

**¶107** In sum, substantial evidence supports the jury's finding that Smith killed K.L. for pecuniary gain.

### H.

**¶108** Smith argues that his conviction for child abuse of K.S. did not qualify as a serious offense aggravator under § 13-751(F)(2) because the trial court failed to instruct the jury that the crime of child abuse must be committed "against a child." We review de novo "whether jury instructions properly state the law." *State v. (Christopher M.) Payne*, 233 Ariz. 484, 505 ¶ 68 (2013).

**¶109** The list of serious offenses under § 13-751(F)(2) includes Dangerous Crimes Against Children ("DCAC") under A.R.S. § 13-705.

---

[6] We note that although this version of the pecuniary gain statute applies here, in 2019 the legislature amended and renumbered the statute. As amended, § 13-751(F)(3) is more limited in its scope, stating that pecuniary gain requires proof the "defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value, or the defendant committed the offense as a result of payment, or a promise of payment, of anything of pecuniary value."

Child abuse committed pursuant to § 13-3623(A)(1) is a DCAC, and therefore qualifies as a serious offense aggravator, if it is "intentionally or knowingly" committed "against a minor who is under fifteen years of age." §§ 13-705(Q)(1)(h); -3623(A)(1).

¶110        Here, the jury convicted Smith of intentional or knowing child abuse under § 13-3623(A)(1) and found that K.S. was under the age of fifteen. As a result, Smith's conviction for child abuse was a DCAC and qualified as a serious offense aggravator. §§ 13-705(Q)(1)(h), -751(F)(2).

¶111        Smith argues, however, that because § 13-3623(A)(1) allows child abuse to be committed "knowingly," to qualify as a serious offense the jury must determine whether the offense was committed against a child. Smith contends that the jury never made this finding and, as a result, it never determined whether he knowingly shot K.S. (a crime against a child), or whether he simply "pulled the trigger" with no intent to harm her (a crime committed fortuitously, but not knowingly against a child). *See State v. (Roger) Williams*, 175 Ariz. 98, 101, 102–04 (1993) (holding that the evidence did not show the defendant committed a crime against a child where the defendant, who was driving while intoxicated, struck and injured the occupants of a car, including a minor under the age of fifteen; under these specific circumstances, the court determined that the defendant could not be convicted of a DCAC because he had no way of knowing a child was in the car).

¶112        We disagree. The record shows that Smith's conduct was directed against K.S. Smith fired one bullet into the back of K.L.'s head, and another bullet into K.S.'s thigh. Further, after K.S. was wounded, Smith knowingly left the scene while the infant was bleeding and lying face down on the ground. *See State v. Sepahi*, 206 Ariz. 321, 322–23 ¶¶ 10, 12, 324 ¶ 19 (2003) (holding that defendant committed a DCAC where he shot a fourteen-year-old in the stomach; the court concluded that such conduct was "directed, aimed at, and targeted . . . against a victim under the age of fifteen"). And here the State alluded to both theories—shooting K.S. in the thigh and abandoning her after she was wounded—as grounds for convicting Smith of child abuse. *See also State v. Herrera*, 176 Ariz. 9, 16 (1993) (explaining that the state must only prove the elements of the crime, and a defendant is not entitled to a unanimous verdict on the "precise manner in which the act was committed" (quoting *State v. Encinas*, 132 Ariz. 493, 496 (1982))).

¶113      Additionally, none of Smith's proffered cases suggests that child abuse under § 13-3623(A)(1) is not a crime committed "against" a child. *See* (*Christopher M.*) *Payne*, 233 Ariz. at 505–06 ¶¶ 69–72 (holding that, with respect to the crime of child abuse under § 13-3623(A)(1), the State need not establish any mental state regarding the circumstances of the offense, but emphasizing that the mental states of "intentionally or knowingly" applied to the defendant's actions); *State v. Millis*, 242 Ariz. 33, 41 ¶ 26 n.7 (App. 2017) (to same effect); *State v.* (*Joe M.*) *Johnson*, 181 Ariz. 346 (App. 1995) (holding that under § 13-3623(B), which makes it illegal to place children in a physically dangerous environment, maintaining such a dangerous environment in an apartment was child abuse); *State v. Greene*, 168 Ariz. 104, 107–08 (App. 1991) (holding that unsanitary apartment was not necessarily "likely" to produce serious physical injury under § 13-3623(B)(1)); *State v. Cantua-Ramirez*, 149 Ariz. 377, 379–80 (App. 1986) (determining that a defendant who accidentally struck a baby could be guilty under transferred intent).

¶114      Smith also argues that he was entitled to a separate jury instruction in the aggravation phase stating that for child abuse to qualify as a serious offense under § 13-751(F)(2), the jury must determine the offense was committed against a child. We disagree. The trial court was not required to give this instruction because proof of the underlying crime necessarily included a finding that the offense was committed against a child. *See supra* ¶¶ 109–10, 112; *State v. Coghill*, 216 Ariz. 578, 590 ¶ 49 (App. 2007) (determining that defendant who knowingly possessed child pornography satisfied the DCAC statute because the jury "implicitly found that his conduct focused on the children"); *cf.* (*Bernard*) *Smith*, 146 Ariz. at 498–99 (explaining that a jury is not required to separately find dangerousness where an element of the offense charged requires proof of its dangerous nature); *State v. Gatliff*, 209 Ariz. 362, 365–66 ¶¶ 17–18 (App. 2004) (to same effect). *But see State v. Larin*, 233 Ariz. 202, 212–13 ¶¶ 38, 42 (App. 2013) (stating that even though a defendant's armed robbery conviction was "inherently dangerous" because it involved possessing a deadly weapon during the course of a robbery, the jury could have found the dangerousness allegation not proven because it acquitted the defendant of the related possession of a deadly weapon charge).

¶115      We reject Smith's claim that failure to give the subject instruction was structural error. The "relatively few instances in which we . . . regard error as structural" are those that "deprive defendants of basic protections and infect the entire trial process from beginning to end." *State v. Bush*, 244 Ariz. 575, 591 ¶ 66 (2018) (internal quotation marks

omitted) (quoting *State v. Ring*, 204 Ariz. 534, 552 ¶ 45 (2003)). Those instances include:

> a biased trial judge, complete denial of criminal defense counsel, denial of access to criminal defense counsel during an overnight trial recess, denial of self-representation in criminal cases, defective reasonable doubt jury instructions, exclusion of jurors of the defendant's race from grand jury selection, excusing a juror because of his views on capital punishment, and denial of a public criminal trial.

*Ring*, 204 Ariz. at 552–53 ¶ 46. None of those instances are present here.

## I.

**¶116** Smith argues that the trial court violated the Eighth Amendment by instructing the jury that it could consider mitigation only "so long as" it related to Smith's character, propensity, history or record, or circumstances of the offense. "'We review a trial court's refusal to give a jury instruction for abuse of discretion,' but we assess the legal adequacy of the instructions de novo, viewing them in their entirety." *State v. Miller*, 234 Ariz. 31, 43 ¶ 41 (2013) (quoting *Garcia*, 224 Ariz. at 18 ¶ 75).

**¶117** The "Capital Case 2.3–Mitigation" instruction provides that mitigating circumstances "are any factors that are a basis for a life sentence instead of a death sentence *so long as* they relate to any sympathetic or other aspect of the defendant's character, propensity, history or record or circumstances of the offense." RAJI (Crim.) Capital Case 2.3, at 553 (3d ed. 2016) (emphasis added). Before the penalty phase, Smith requested that the court deviate from the RAJI and instead instruct the jury to consider "relevant factors . . . *including* any aspect of the defendant's character, propensities or record and any other circumstances of the offense." (emphasis added). Denying Smith's request, the trial court followed the RAJI.

**¶118** The court's instructions were proper. A jury may only consider relevant mitigation factors, which "includ[e] any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." § 13-751(G); *State v. Villalobos*, 225 Ariz. 74, 83 ¶ 40 (2010) ("Relevance . . . is the only statutory limitation on the jury's ability to consider mitigation evidence."); *see also Lockett v. Ohio*, 438 U.S. 586, 604 & n.12 (1978) (requiring a jury consider categories of relevant mitigation as "any aspect of a defendant's character or record and any of the

circumstances of the offense"); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (adopting *Lockett*'s plurality opinion).

**¶119** Smith first argues that the United States Supreme Court expanded the *Lockett/Eddings* mitigation categories in *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433 (1990)). Smith is incorrect. In *Tennard*, the Court held that a jury must be allowed to consider factors without a causal connection to the crime if they "tend[] logically to prove or disprove" a fact that the jury could "reasonably deem to have mitigating value." 542 U.S. at 284 (quoting *McKoy*, 494 U.S. at 440). Neither *Tennard* nor *McKoy* expanded or altered the categories provided by *Lockett/Eddings*. *See id.* at 285; *McKoy*, 494 U.S. at 438–39, 443; *see also State v. Burns*, 237 Ariz. 1, 31 ¶ 144 (2015) (holding that jury instructions restricting mitigation to the *Lockett/Eddings* categories were proper); *State v. Velazquez*, 216 Ariz. 300, 311 ¶ 44 (2007) (to same effect); *State v. Tucker*, 215 Ariz. 298, 317 ¶ 72 (2007) (providing that the "so long as" mitigation instruction allowed the jury to consider "all relevant evidence").

**¶120** Next, Smith argues that the instruction was invalid because it misstated § 13-751(G), which provides that the jury must consider relevant factors "including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." But we have consistently held that the "so long as" language in RAJI 2.3 complies with § 13-751(G). *Burns*, 237 Ariz. at 31 ¶ 144; *Velazquez*, 216 Ariz. at 311 ¶ 44; *Tucker*, 215 Ariz. at 317 ¶ 72.

**¶121** Accordingly, we conclude that the jury was properly instructed, and no error occurred.

## J.

**¶122** Smith argues that the trial court and the State violated the Sixth and Eighth Amendments and article 2, section 24 of the Arizona Constitution by advising the jury that they could grant mercy only if the evidence supported it. We review de novo whether the trial court has properly instructed the jury in a capital case. *State v. Glassel*, 211 Ariz. 33, 53 ¶ 74 (2005). Where the error is not preserved, we will reverse if the error is structural or fundamental. *Valverde*, 220 Ariz. at 584–85 ¶¶ 10–12.

**¶123** During the penalty phase, the trial court instructed the jury that "mitigating circumstances are not an excuse or justification for the offense but are factors that, in fairness and mercy, may reduce the

Defendant's moral culpability." RAJI Capital Case 2.3. During its closing argument, the State told the jury that it could not base its decision on "just mere sympathy not related to the evidence . . . . It cannot be mercy for mercy's sake" and "[y]ou're not to be swayed by mere sympathy not related to the evidence . . . . You cannot have mercy for mercy's sake. You cannot have sympathy for sympathy's sake. It must be related to this case."

¶124 We find no error, much less fundamental error. The court's instruction and the State's argument were legally accurate. "The Constitution does not require . . . that a jury 'be able to dispense mercy on the basis of a sympathetic response to the defendant.'" *Carreon*, 210 Ariz. at 70 ¶ 83 (quoting *Johnson v. Texas*, 509 U.S. 350, 371 (1993)); *California v. Brown*, 479 U.S. 538, 542–43 (1987) (to same effect). "[M]ercy is not a mitigating circumstance" but is a "concept jurors may apply in evaluating the existence of mitigating circumstances." *State v. Andriano*, 215 Ariz. 497, 507 ¶¶ 47–49 (2007), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012).

¶125 Smith's reliance on *Gregg v. Georgia*, 428 U.S. 153, 199 (1976), is misplaced. There, the Supreme Court upheld a statute allowing a jury to make a binding recommendation of mercy absent any mitigation. *Id.* at 197. The Court, however, did not suggest that juries *must* be permitted to consider mercy for mercy's sake. *See id.*; *Johnson*, 509 U.S. at 371–72 (subsequently explaining that a jury need not be allowed to dispense mercy on the basis of sympathy).

¶126 Smith also cites article 2, section 24 of the Arizona Constitution, claiming it "requires that juries have an unfettered right to grant mercy in capital cases." But article 2, section 24 requires only the right to a "speedy public trial by an impartial jury." It does not suggest an "unfettered right" to mercy. *See* Ariz. Const. art. 2, § 24.

¶127 Finally, we reject Smith's claim that the trial court's instruction regarding mercy was structural error. None of the instances involving structural error are present here. *See Ring*, 204 Ariz. at 552–53 ¶ 46 (listing the "relatively few instances" of structural error and noting that in each the error infected "the entire trial process" from beginning to end).

K.

¶128 Smith argues the trial court abused its discretion by allowing inadmissible mitigation rebuttal by the State. We review a trial court's

admission of evidence during the penalty phase for abuse of discretion and give "deference to a trial judge's determination of whether rebuttal evidence offered during the penalty phase is 'relevant' within the meaning of the statute." *State v. Champagne*, 247 Ariz. 116, 142 ¶ 87 (2019) (quoting *State v. McGill*, 213 Ariz. 147, 156–57 ¶ 40 (2006)). "The threshold for relevance is a low one." *State v. Leteve*, 237 Ariz. 516, 529 ¶ 48 (2015) (quoting *Roque*, 213 Ariz. at 221 ¶ 109). Because Smith failed to object at trial, we review this claim for fundamental error. *Escalante*, 245 Ariz. at 138 ¶ 1.

**¶129** Smith first claims that the testimony of the State's rebuttal expert, Dr. Pitt, was inadmissible because it was not relevant to his proffered mitigation. We disagree. Dr. Pitt, a forensic psychologist, testified about several matters relevant to whether Smith should be shown leniency, including Smith's mental health, relationship with Ward, and actions leading up to K.L.'s murder. Moreover, under § 13-752(G), the State "may present any evidence" during the penalty phase "that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." Additionally, "regardless of whether the defendant presents evidence of mitigation, the state may present any evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the defendant's character, propensities, criminal record or other acts." *Id.*; *see* § 13-751(G) (providing that the jury "shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death"); *Champagne*, 247 Ariz. at 142 ¶¶ 89–90 (explaining that mitigation rebuttal may include any evidence that demonstrates the defendant should not be shown leniency, and need not be relevant to the defendant's proffered mitigation); *see also State v. Guarino*, 238 Ariz. 437, 440 ¶ 13 (2015) ("Taken together, A.R.S. §§ 13-751(G) and -752(G) permit jurors to hear evidence relating to circumstances of the crime and the defendant's character."); *State v. Pandeli*, 215 Ariz. 514, 527 ¶¶ 41–42 (2007) (allowing any evidence demonstrating the defendant should not be shown leniency).

**¶130** Smith next argues that four of Pitt's comments were improper because they were more prejudicial than probative and violated due process by rendering the trial "fundamentally unfair." *Guarino*, 238 Ariz. at 441 ¶ 15 (stating that due process is violated if rebuttal evidence "is so unduly prejudicial that it renders the trial fundamentally unfair" (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991))).

### 1. Assault at Kiwanis Park

¶131    Pitt stated that Ward did not compel Smith to "set up what happened at Kiwanis Park" and it was "his opinion" that "Smith engaged in a significant amount of planning [for the murder] that date[d] back to at least that incident in Kiwanis Park in August." Smith argues that these statements were unduly prejudicial and improperly implied that Smith was responsible for K.L.'s attack. We disagree. Although Smith was not charged for the Kiwanis Park incident, substantial evidence had been presented to the jury suggesting that Smith helped plan the attack. *Supra* ¶¶ 5–6. Thus, Pitt's statements were not prejudicial to the extent they rendered the trial "fundamentally unfair." *Guarino*, 238 Ariz. at 441 ¶ 15.

### 2. Attempted Murder of K.S.

¶132    Pitt implied that Smith attempted to kill K.S. For example, Pitt stated that not everyone involved in a dysfunctional relationship goes "out and commit[s] murder and attempted murder" and that Smith chose "to tak[e] another person's life and attempt[] to take the life of his own baby." Smith argues these statements were unduly prejudicial because Smith was not charged with attempting to murder K.S.

¶133    We conclude that these statements were not so prejudicial as to make the trial "fundamentally unfair." *Id.* Pitt's comments addressed whether Smith should be shown leniency. Further, any prejudice Smith may have suffered by Pitt referring to his crime against K.S. as attempted murder was minimal. Specifically, the jury had already convicted Smith of child abuse for shooting K.S., a two-month-old infant, and leaving her face down on the ground with a bullet wound. We find no error.

### 3. Dr. Lacey

¶134    Pitt also disagreed with Dr. Lacey, Smith's mitigation witness, about the impact of Ward's emotional abuse on Smith. Pitt testified that he "respectfully disagree[d]" with Dr. Lacey about blaming "solely . . . the relationship between [Smith] and [K.] Ward . . . for choices that [Smith] made." Pitt also stated that, "my sense in looking at Dr. Lacey's report—I didn't know him—or I didn't know of him and my sense is that he didn't— my guess was he really didn't have much forensic experience" and was "making this leap" between the dysfunctional relationship with Ward and Smith's actions.

**¶135**      Pitt's comments about Lacey's qualifications were not unduly prejudicial. As a general matter, an expert should not comment on the credibility of another witness. *See, e.g.*, *State v. Lindsey*, 149 Ariz. 472, 475 (1986) (explaining that expert witnesses should not provide opinions about the credibility of another witness); *State v. Reimer*, 189 Ariz. 239, 240–41 (App. 1997) (to same effect). However, it was not improper for Pitt to question Lacey's conclusions or his expert qualifications. *See* Ariz. R. Evid. 702; *State v. Hummert*, 188 Ariz. 119, 126 (1997) (explaining that an expert's opinion and the extent of their knowledge is "fair game during cross-examination"); *Downs v. Scheffler*, 206 Ariz. 496, 501 ¶ 21 (App. 2003) ("Arizona has a long-favored practice of allowing full cross-examination of expert witnesses, including inquiry about the expert's sources, relations with the hiring party and counsel, possible bias, and prior opinions." (quoting *Ariz. Indep. Redistricting Comm'n v. Fields*, 206 Ariz. 130, 143 ¶ 43 (App. 2003))).

### 4. Premeditation

**¶136**      Finally, Pitt testified that there was "nothing rash or impulsive" about K.L.'s murder; it was "thought out, was executed," and there "were a series of behaviors engaged [in] after the offense to attempt to evade apprehension and avoid detection." Smith argues that Pitt's discussion of premeditation "improperly implied" that Smith did not deserve leniency because the murder was premeditated. We disagree. An expert may comment about a defendant's deliberate actions in planning a murder and avoiding detection. *See Champagne*, 247 Ariz. at 143 ¶¶ 92–93 (finding testimony not unduly prejudicial when it "simply explained facts" and gave "details . . . about [the defendant] fleeing the scene").

**¶137**      Thus, we conclude that none of Smith's claims regarding Pitt's testimony survive fundamental error review. *Escalante*, 245 Ariz. at 140–41 ¶ 16. Pitt's testimony, at most, offered opinions based on evidence already presented to the jury. As a result, there was no prejudice.

### L.

**¶138**      Smith argues that the State engaged in prosecutorial error in violation of his due process rights. We will reverse Smith's conviction because of prosecutorial error if: "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Anderson*, 210 Ariz. 327, 340, *supplemented*, 211 Ariz. 59 (2005) (quoting *State v. Atwood*, 171

Ariz. 576, 606 (1992)).  Because Smith never objected, we review this claim for fundamental error.  *State v. Prince*, 226 Ariz. 516, 537 ¶ 84 (2011).  To establish prejudice, a defendant must show that absent the prosecutorial error, "a reasonable jury could have [plausibly and intelligently] reached a different verdict."  *Escalante*, 245 Ariz. at 144 ¶¶ 29, 31.  Although a defendant must typically establish prejudice under prongs 1 or 2 of *Escalante*, *id.* at 142 ¶ 21,  a "defendant claiming cumulative error based on prosecutorial misconduct need not separately assert prejudice since a successful claim necessarily establishes the unfairness of a trial."  *State v. Vargas*, 249 Ariz. 186, 190 ¶ 13 (2020).

### 1.  Fraud on the Court

**¶139**        Smith argues that the State committed "fraud on the court" by obtaining the CSLI Order from the IA Court rather than the judge assigned to the case.  Smith's claim finds no support in the record.  Neither § 13-3016(C) nor the Arizona Rules of Criminal Procedure require the State to obtain a court order from the trial judge assigned to the case.  *Supra* ¶¶ 37–39.  And here, the record shows that it was common practice for PPD to apply for such an order with the IA Court.

### 2.  Serious Offense Aggravator

**¶140**        In the aggravation phase, the State argued that the (F)(2) "serious offense" aggravator had been proven when the jury found Smith guilty of child abuse.  Specifically, the State argued "You have already found the Defendant guilty of child abuse of [K.S.] in this case.  The Defendant shot [K.S.] in the leg."  Smith argues that the State misstated the law because the (F)(2) aggravator requires more than "bare child abuse"; rather, it requires a separate finding that the offense was "against a child."  As discussed *supra* ¶¶ 112–15, the trial court was not required to instruct the jury that the child abuse must be against K.S.  Therefore, the State properly stated that Smith's child abuse conviction was a serious offense.

### 3. Sentencing

**¶141**        At the end of the penalty phase, the State argued: "The question for you now is what is the appropriate punishment for the murder of [K.L.] and the shooting of a two-month-old child.  Do these acts deserve the death penalty?"  The State later argued, "[L]ook at the murder, look at the child abuse, the aggravating factors, and then decide for yourself is it enough?"  Smith claims that by making this argument, the State improperly

suggested that the jury could sentence Smith for his child abuse conviction, even though Smith's child abuse sentence was imposed by the trial court.

**¶142** The State's argument was proper. The jury was required to consider the (F)(2) serious offense aggravator in making its sentencing determination. *See* § 13-751(F). The fact that the (F)(2) aggravator, child abuse, also carried a separate sentence did not prohibit the State from urging the jury to consider it as an aggravator for capital sentencing purposes.

### 4. Kiwanis Park

**¶143** Finally, during closing argument, the State told the jury that Smith "probably" asked Marley to assault K.L. Smith argues that this statement amounts to prosecutorial error because it is speculative and unsupported by evidence.

**¶144** We disagree. "[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions." *Goudeau*, 239 Ariz. at 466 ¶ 196 (quoting *State v. Bible*, 175 Ariz. 549, 602 (1993)). In determining whether the State engaged in prosecutorial error during its closing, "we consider two factors: (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks." *Id.* (internal quotation marks omitted) (quoting *State v. Nelson*, 229 Ariz. 180, 189 ¶ 39 (2012)).

**¶145** Smith has not shown error, much less fundamental error. The prosecutor's statements were based on reasonable inferences from the evidence, *supra* ¶¶ 5–6, and there is no evidence that they could have caused the jury to change its verdict. *Escalante*, 245 Ariz. at 144 ¶ 31. Additionally, any prejudice was cured by the court instructing the jury that closing arguments were not evidence. (*Christopher M.*) *Payne*, 233 Ariz. at 518 ¶ 151.

**¶146** Finally, because none of these instances amount to prosecutorial error, we need not consider if the individual acts collectively amount to "persistent and pervasive misconduct." *Escalante-Orozco*, 241 Ariz. at 280 ¶ 91; *see State v. Bocharski*, 218 Ariz. 476, 492 ¶ 75 (2008) (holding that "[a]bsent any finding of [error], there can be no cumulative effect").

M.

¶147　　　Smith argues that the trial court coerced a death verdict when it gave an impasse instruction after the jury claimed it could not reach a verdict. We review a court's decision to give an impasse instruction for an abuse of discretion. *State v. Kuhs*, 223 Ariz. 376, 384 ¶ 42 (2010). Coercing a verdict from the jury is reversible error. *State v. Cruz*, 218 Ariz. 149, 167 ¶ 112 (2008).

¶148　　　The jury deliberated for two and a half hours before telling the bailiff that they were unable to "come to an agreement." The court then conferred with counsel and stated that the jurors were at an impasse. The court decided "to explore" the issue with the foreperson:

> THE COURT: All right. Madam foreperson, I've been informed that you've been unable to reach a decision at this point.
>
> THE FOREPERSON: That's correct.
>
> THE COURT: All right. In your view, do you think further deliberation could result in a verdict?
>
> THE FOREPERSON: No.
>
> THE COURT: All right. I note that you probably were deliberating about two and a half hours. That actually isn't that long of a period of time. You don't think there's any chance that you could reach a consensus?
>
> THE FOREPERSON: It's possible. I guess we could.
>
> THE COURT: All right. Let's go ahead and –
>
> THE FOREPERSON: Is that not a long time?
>
> THE COURT: I'm sorry?
>
> THE FOREPERSON: Is that not a long time to deliberate? I mean –

> THE COURT: Well, it's however long that you feel that you need to deliberate. Let's go ahead and pass out – I'm going to give you one more instruction.

**¶149** Following this exchange, the court referenced the previously read instruction, "Duty to Consult With One Another," which explains that jurors should deliberate to reach a just verdict but not change their "honest belief[s] . . . because of the opinions of . . . [other] jurors, or for the mere purpose of returning a verdict." RAJI (Crim.) Capital Case 2.4, at 554 (3d ed. 2016). Next, the court gave the standard impasse instruction. RAJI (Crim.) Standard Instruction 42, at 15.3 (3d ed. 2016). Immediately following the impasse instruction, the court stated:

> All right. And having said that, there are no time limits. Whatever you think is appropriate. If you think that the amount of time that you've spent already is appropriate, that's fine. And we will accept that. And if you discuss this amongst yourselves and feel that you don't need to deliberate further, let us know that and we'll take the next step at that point. Okay. So just consider this instruction. Take it into consideration. Let us know how you want us to proceed.

The jury deliberated for another forty-nine minutes before returning a death sentence.

**¶150** Arizona Rule of Criminal Procedure 22.4 provides:

> If the jury advises the court that it has reached an impasse in its deliberations, the court may, in the parties' presence, ask the jury to determine whether and how the court and counsel can assist the jury's deliberations. After receiving the jurors' response, if any, the court may direct further proceedings as appropriate.

**¶151** Here, we must "determine if the independent judgment of the jury was displaced." *State v. Huerstel*, 206 Ariz. 93, 97 ¶ 5 (2003). In conducting this analysis, we "view[] the actions of the judge and the comments made to the jury based on the totality of the circumstances." *Id.* One factor we consider is whether the court knew the numerical split among the jurors when it addressed the impasse. *Id.* at 99–100 ¶¶ 17–19, 100–01 ¶ 23 (finding coercion where the jury did not indicate a need for assistance and the court knew the numerical division of the jurors and twice suggested that a holdout juror reconsider); *State v. McCrimmon*, 187 Ariz.

169, 172 (1996) (explaining that awareness of the numerical division was "an important factor"). Additionally, we also consider the length of deliberations prior to the jury's impasse. *See Huerstel*, 206 Ariz. at 99 ¶ 17 (determining that three days of deliberations following a three-week trial "did not clearly signal that th[e] jury had reached an impasse"); *Cruz*, 218 Ariz. at 166–67 ¶¶ 108–09, 115 (2008) (finding no coercion where the jury indicated they were deadlocked but they had only been deliberating three hours); *Kuhs*, 223 Ariz. at 384 ¶ 44, 385–86 ¶¶ 59–60 (finding no coercion when impasse instruction was given after two days where jury did not ask for help).

¶152        We find no error. The court did not know the numerical split among jurors, and the jury deliberated for only two and a half hours before reaching an impasse. Additionally, the court reiterated several times that it was not trying to displace the jury's judgment, explaining that the jury had "however long that you feel that you need to deliberate," and "there are no time limits" and they should take "whatever [they] think is appropriate." The standard impasse instruction provided to the jury also stated that it was not an attempt to "force . . . a verdict," jurors "should not change [their] beliefs," but should simply "discuss this instruction . . . [and] advise [the judge] in writing . . . whether [the court or lawyers] can attempt to assist" the jurors. RAJI Standard Instruction 42. The court also stated that it was "fine" if they thought the time already spent was sufficient.

¶153        Smith's other arguments are unpersuasive. For example, Smith contends that the court improperly told the jurors that they had an "apparent need for help," suggesting there was something wrong, e.g., in failing to reach a verdict. We disagree. A judge is not required to "blindly accept" an impasse, *see Kuhs*, 223 Ariz. at 384 ¶ 41, and here, it was not unreasonable for the judge to assist the jury.

¶154        Next, Smith argues that the court's assurances—that it was not trying to coerce a verdict and the jury should take however long they need—were "hollow." He relies on *Huerstel*, 206 Ariz. at 101 ¶ 24, but that case is distinguishable. There, the court's impasse instruction effectively singled out one holdout juror. *Id.* at 98 ¶¶ 9, 11. In contrast, here, the court made a general statement—that two and half hours is not actually that long—to the entire jury and then immediately instructed them to take all the time they needed.

¶155        Smith also argues that the trial court erred by denying his request to include a non-unanimous option on the verdict form.

Specifically, Smith requested a verdict form that included an option stating, "unable to reach a unanimous decision" or "unable to agree." But the absence of this option does not establish coercion. The court informed the jury that if they could not unanimously agree, the foreperson should let the judge know. And the court informed the jury several times that a non-unanimous verdict was "perfectly acceptable."

¶156 Finally, we note that although the jury returned its verdict shortly after the impasse instruction, *see Lowenfield v. Phelps*, 484 U.S. 231, 237, 240 (1988) (considering the length of time between reaching a verdict and receiving an impasse instruction), under the totality of the circumstances we conclude that the trial court did not coerce the jury.

N.

¶157 Because Smith committed the murder after August 1, 2002, this Court must review the jury's findings of aggravating circumstances and the imposition of a death sentence for abuse of discretion, A.R.S. § 13-756(A), viewing the facts in the light most favorable to sustaining the verdict. *State v. Naranjo*, 234 Ariz. 233, 249 ¶ 81 (2014). "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *Id.* (quoting *Delahanty*, 226 Ariz. at 508 ¶ 36).

1. <u>Aggravating Circumstances</u>

¶158 The State alleged, and the jury found beyond a reasonable doubt, two aggravating circumstances: (1) Smith was convicted of a serious offense (child abuse), § 13-751(F)(2); and (2) Smith killed K.L. for pecuniary gain, *id.* (F)(5). The (F)(2) aggravator involved the shooting of an infant, K.S., and, as a result, was a particularly strong aggravating circumstance. The record provides substantial evidence to support both aggravators, *supra* ¶¶ 101–07, 110–15. Therefore, the jury did not abuse its discretion in finding these aggravating circumstances.

2. <u>Death Sentence</u>

¶159 The jury also did not abuse its discretion in sentencing Smith to death. This Court must uphold a death sentence "if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Naranjo*, 234 Ariz. at 250 ¶ 89 (internal

quotation marks omitted) (quoting *State v. Gallardo*, 225 Ariz. 560, 570 ¶ 52 (2010)).

¶160    Smith presented twenty-nine non-statutory mitigators, asserting that he was driven to keep his family together and avoid negative stereotypes about African American fathers. He also argued that he provided for Ward though she emotionally abused, harassed, and emasculated him, threatened to take his son away from him, and displayed Borderline Personality Disorder symptoms. Smith argued that he did not live up to his family's expectations and that they were highly critical of his romantic relationships, had a history of failed relationship, and did not believe in therapy. Finally, he argued that he was sleep deprived, grieving a miscarriage suffered by Ward, lacked conflict resolution skills, had no criminal record, maintained employment, volunteered, played sports in high school, earned an academic scholarship, earned an associate degree, loves children, was a candidate to become a foster parent, and had been a model inmate. He presented no statutory mitigators.

¶161    The record supports the jury's determination. A reasonable juror could find many of these mitigators—sleep deprivation, grief, family pressure—unpersuasive. And Smith's positive background could have demonstrated his ability to handle conflict without murder. Therefore, the jury did not abuse its discretion in sentencing Smith to death.

### III.

¶162    Smith raises seventeen other issues to avoid their preclusion. Because this Court has previously rejected each of these claims, we decline to revisit them here.

### CONCLUSION

¶163    We affirm Smith's convictions and sentences.