IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

JAMES MURRAY REAVES III,
*Appellant.*

No. 2 CA-CR 2019-0253
Filed February 16, 2022

---

Appeal from the Superior Court in Pima County
No. CR20170282001
The Honorable Howard Fell, Judge Pro Tempore

**REMANDED IN PART; AFFIRMED IN PART**

---

COUNSEL

Mark Brnovich, Arizona Attorney General
Linley Wilson, Deputy Solicitor General/Section Chief of Criminal Appeals
By Karen Moody, Assistant Attorney General, Tucson
*Counsel for Appellee*

James Fullin, Pima County Legal Defender
By Alex Heveri, Assistant Legal Defender, Tucson
*Counsel for Appellant*

**OPINION**

Presiding Judge Eckerstrom authored the opinion of the Court, in which Chief Judge Vásquez and Judge Espinosa concurred.

E C K E R S T R O M, Presiding Judge:

**¶1** James Reaves III appeals from his convictions and sentences for first-degree murder, first-degree burglary, and aggravated assault. He argues the trial court erred in denying his challenge to the state's peremptory strike, brought pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), that it made multiple errors in its jury instructions, and that it incorrectly precluded evidence that he suffers from post-traumatic stress disorder. Because we agree the court erred in fulfilling the constitutional obligations set forth by *Batson* and its progeny, we remand for the court to make findings consistent with this opinion. We otherwise affirm Reaves's convictions and sentences.

**Factual and Procedural Background**

**¶2** We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all inferences against Reaves. *See State v. Felix*, 237 Ariz. 280, ¶ 30 (App. 2015). Reaves was involved in a romantic relationship with A.T. for a number of years. Beginning in December 2015, he lived with A.T. in a house she shared with her grandmother. In late December 2016, A.T. and Reaves argued, and he was asked to move out of the house. Within two days, Reaves removed his belongings and returned one of the two keys he possessed to the residence. Until the date of the incident, he lived out of his truck.

**¶3** One evening in early January 2017, Reaves let himself into the house when A.T. was not home and watched television for a while. He then took a nap in his vehicle, which was parked in the driveway. A.T. and a male friend, D.P., arrived at the house. After D.P. went inside, Reaves had a brief conversation with A.T., telling her that D.P.—whom Reaves did not trust—needed to leave and, at minimum, should not be allowed to stay in A.T.'s bedroom. Reaves later looked into the house's windows and saw A.T. and D.P. together in her bedroom.

¶4        Reaves then drove to a gas station, where he told the attendant he was angry because he had caught his girlfriend cheating and wanted to damage her car.  Reaves showed the attendant a metal bar he planned to take with him in case "the guy" tried to "come at him."  Reaves continued to text and call A.T. about her relationship with D.P.  During one call, Reaves angrily asked A.T. if she and D.P. had just had sex, and she answered in the affirmative.  Reaves then screamed at A.T. that she had "better start saying [her] goodbyes" because he was returning to the house and would kill D.P. if he was still there.

¶5        Shortly afterward, Reaves arrived at A.T.'s house.  He let himself in, visibly "[v]ery upset," repeated that he was going to kill D.P., and exchanged the metal bar for knives from the kitchen, which he held in both hands.  He entered the bedroom, told D.P. to get out, and D.P. refused.  D.P. then approached Reaves—smirking according to Reaves—and extended his hand, as if for a handshake.  Reaves ducked below D.P.'s hand and stabbed him seventeen times.  He also cut A.T.'s arm when she attempted to intervene.  D.P. died from his injuries.

¶6        Reaves left the house and returned to the gas station, where he told the attendant he had stabbed a man.  He washed his hands and changed out of his bloodied shirt, which he threw in a dumpster before looking up and smiling into a security camera.  An acquaintance drove him out of town, where he remained for several days.  During the drive, Reaves texted his father, including sending a link to the penalties associated with first-degree murder in Arizona.  He also texted two other people, stating he had killed someone.  Reaves later testified that he had planned to kill himself, and in preparation he recorded a video on his cell phone in which he admitted to killing D.P.  But Reaves ultimately turned himself in to police.

¶7        After a seven-day trial, Reaves was convicted of first-degree murder, first-degree burglary, and aggravated assault, and he was sentenced to natural life in prison, plus 7.5 years.  This appeal followed.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

### *Batson* Challenge[1]

¶8      The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." In the context of jury trials, this clause ensures that each individual venireperson carries "the right not to be excluded from [a jury] on account of race." *Powers v. Ohio*, 499 U.S. 400, 409 (1991). It protects a core exercise of democratic participation, because "[o]ther than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019). Therefore, "[e]xclusion of [B]lack citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Batson*, 476 U.S. at 85. In short, "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers*, 139 S. Ct. at 2244.

¶9      Since *Batson*, federal law has "vigorously enforced and reinforced the decision, and guarded against any backsliding," *Flowers*, 139 S. Ct. at 2243, recognizing that "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process," *id.* at 2242. "[T]rial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Id.* at 2243.

¶10     Reaves is Caucasian. His jury pool included two mental health professionals. One, J.F., is Black and holds a PhD in clinical psychology. The other, A.S., is Caucasian, holds a master's degree, and works as a licensed therapist. Each agreed that her professional experiences would not hinder her ability to be fair and impartial. After the state peremptorily struck J.F., Reaves raised a challenge under *Batson*. The following exchange ensued:

> Court:      All right. So there's a prima facie showing. [State]?
>
> [State]:     Your Honor, the reason that we struck [J.F.]—

---

[1] Effective January 1, 2022, our state supreme court eliminated peremptory challenges from criminal and civil jury selection procedures. Ariz. Sup. Ct. Order R-21-0020 (Aug. 30, 2021).

Court:          Because she's a clinical psychologist?

[State]:        —because she's a clinical psychologist.

[Defendant]:  But the State kept [A.S.], who is a therapist.

Court:          Okay. All right. The court finds that the reason for striking Ms. [J.F.] is race neutral, gender neutral, and that there hasn't been a sufficient showing that it was done for any reason that would be—that would prejudice Mr. Reaves.

[Defendant]:  I believe she referred to herself as a doctor.

Court:          Yes, I remember that, which I thought was amusing. As I said there's been no purposeful discrimination, so the Batson challenge is denied.

The state did not strike A.S., and she served as a juror.

¶11          We will uphold the denial of a *Batson* challenge absent clear error. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). We review issues of law de novo. *State v. Ross*, 250 Ariz. 629, ¶ 16 (App. 2021). A trial court's *Batson* ruling generally turns "on evaluation of credibility," either counsel's credibility in articulating a non-racial motive for the strike or the prospective juror's demeanor and asserted ability to serve in a non-biased manner. *Batson*, 476 U.S. at 98 n.21; *see also Purkett v. Elem*, 514 U.S. 765, 769 (1995); *State v. Porter*, 251 Ariz. 293, ¶ 11 (2021). Because this analysis "is fact intensive," generally "the trial court is in a better position to assess" credibility than is an appellate court. *State v. Newell*, 212 Ariz. 389, ¶ 54 (2006). We therefore "afford great deference to trial court findings in this context." *Porter*, 251 Ariz. 293, ¶ 6; *see also Flowers*, 139 S. Ct. at 2244.

¶12          However, "[d]eference does not by definition preclude relief." *Miller-El v. Dretke (Miller-El)*, 545 U.S. 231, 240 (2005) (alteration in *Miller-El*) (applying doubly-deferential standard for reviewing *Batson* challenges in federal habeas proceedings) (quoting *Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 340 (2003) ("deference does not imply abandonment or abdication of judicial review")); *see also Snyder*, 552 U.S. at 478-79 (finding clear error "even under the highly deferential standard of review" applicable to *Batson* rulings when "trial judge simply allowed the [strike] without explanation"). Rather, to protect the basic principles outlined in *Batson* and its progeny, we must go beyond a cursory review;

5

we must consider "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478.

¶13    A *Batson* challenge initiates a three-step process. *Johnson v. California*, 545 U.S. 162, 168 (2005); *Newell*, 212 Ariz. 389, ¶ 53. First, the defendant must make a prima facie case that the strike was racially discriminatory. *Purkett*, 514 U.S. at 767; *Newell*, 212 Ariz. 389, ¶ 53. If a prima facie case is made, "the State must provide race-neutral reasons for its peremptory strikes." *Flowers*, 139 S. Ct. at 2241. The explanation need not be persuasive or plausible; it must only be facially race-neutral. *Purkett*, 514 U.S. at 768. "[T]he trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Id.* at 767. At this step, the court "must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2241. To make this determination, "*Batson* 'requires the judge to assess the plausibility of [the explanation offered for a challenged strike] . . . in light of all *evidence* with a bearing on it.'" *Ross*, 250 Ariz. 629, ¶ 22 (alterations and emphasis in *Ross*) (quoting *Miller-El*, 545 U.S. at 251-52). The opponent of the strike bears the burden of persuasion to sustain a *Batson* challenge. *Id.* ¶ 17.

¶14    For the purposes of this appeal, we are concerned with whether the trial court satisfied the third step of the *Batson* analysis. Reaves argues the trial court erred when it allowed the state to peremptorily strike "the only African American on the juror panel." In particular, he argues the court erred by "abandon[ing] the inquiry" before considering whether the strike was racially motivated. We agree that under the totality of the circumstances provided in the record before us, the court did not display a deliberative process "designed to produce actual answers to suspicions and inferences that discrimination may have infected" jury selection. *Johnson*, 545 U.S. at 172. We so conclude based on several features of that terse record: (1) the trial court, rather than the prosecutor, first provided the non-discriminatory basis for the strike; (2) the court conducted no further inquiry and sought no further explanation after the defendant observed that the basis applied equally to a similarly situated Caucasian juror who was not struck; (3) the court did not address the juror comparison problem as to the non-discriminatory basis it had itself provided; and (4) the court concluded that inquiry with a gratuitous off-hand remark at the expense of the stricken juror.

¶15    In determining whether the state has purposefully discriminated on the basis of race, "the court may consider the prosecutor's demeanor, the juror's demeanor, the reasonableness or improbability of the

explanations, and whether the proffered rationale has some basis in accepted trial strategy." *Porter*, 251 Ariz. 293, ¶ 11. In addition, the court may consider available factors including, as relevant here, "side-by-side comparisons of" stricken and non-stricken prospective jurors of different races and any "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers*, 139 S. Ct. at 2243. This analysis is not pro forma; the "*Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson*, 545 U.S. at 172.

¶16 If "the reasons provided by the State are clearly pretextual," the strike cannot stand. *State v. Smith*, 250 Ariz. 69, ¶ 67 (2020) (quoting *State v. Roque*, 213 Ariz. 193, ¶ 15 (2006)). For instance, "[i]f a prosecutor's proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar non-[B]lack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 545 U.S. at 241 (describing "side-by-side comparisons" of potential jurors as "[m]ore powerful" than "bare statistics"); *see also Foster v. Chatman*, 578 U.S. 488, 512 (2016) (venireperson comparison alone presented "compelling" evidence of purposeful discrimination). "The comparison can suggest that the prosecutor's proffered explanations for striking [B]lack prospective jurors were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2248.

¶17 Although defendants have repeatedly asked our state's appellate courts to conduct comparisons of similarly situated prospective jurors when reviewing a *Batson* ruling, we are aware of no prior reported case in which a defendant properly preserved that claim for review. *See, e.g.*, *Porter*, 251 Ariz. 293, ¶¶ 20-22 (finding waiver because defendant's failure to raise issue below "deprived the prosecutor of the opportunity to distinguish allegedly similarly situated jurors and divested the trial court of the occasion to conduct an in-depth comparison of the jurors"); *Smith*, 250 Ariz. 69, ¶ 71 (refusing to conduct comparative analysis because defendant "did not raise the issue in the trial court" and therefore waived it); *State v. Medina*, 232 Ariz. 391, ¶¶ 48-49 (2013) (appellate court not required to conduct comparative juror analysis on "cold appellate record," particularly when issue not raised at trial). Because Reaves preserved the issue by expressly drawing the comparison between J.F. and A.S. to the trial court's attention, we address the issue.

¶18 We conclude Reaves raised sufficient evidence the state's strike was infected by purposeful discrimination to trigger the trial court's duty to make a meaningful inquiry into the motive underlying the strike.

*See Purkett*, 514 U.S. at 768 ("ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). Reaves's jury pool included two mental health professionals, similarly but not identically situated, as one was a clinical psychologist with a PhD and the other was a therapist with a master's degree. *See Flowers*, 139 S. Ct. at 2249 (defendant "not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent"); *see also United States v. Alvarez-Ulloa*, 784 F.3d 558, 566-67 (9th Cir. 2015) (suggesting law student with criminal defense experience would be similarly situated to other lawyers or law students). Other than confirming that they could remain fair and impartial, neither potential juror was questioned further about how her profession might influence her role as a juror. The state exercised its peremptory strike against only the Black mental health professional. And, although Reaves directly presented the side-by-side comparison of the stricken and the non-stricken potential jurors to the court during the brief *Batson* colloquy, neither the state nor the court offered any explanation at all to rebut this "evidence tending to prove purposeful discrimination." *Miller-El*, 545 U.S. at 241. Instead, the court abruptly denied the *Batson* challenge, finding, without explanation, "no purposeful discrimination."

¶19　　　Were we to read in isolation the trial court's finding that no purposeful discrimination had occurred, we might be disinclined to find clear error. After all, our state's *Batson* jurisprudence does not uniformly require a court to make express findings on the record when ruling on a *Batson* challenge. *See Porter*, 251 Ariz. 293, ¶ 17. However, "we must examine the whole picture," being careful not to review a single strike "in isolation." *Flowers*, 139 S. Ct. at 2250. Here, the trial court stopped the *Batson* inquiry when the non-discriminatory basis had been plausibly challenged and without seeking further explanation from the state. In this respect, the court's finding of no discriminatory purpose "was not fairly supported by the record." *Purkett*, 514 U.S. at 769.

¶20　　　Specifically, the state's proffered reason for striking J.F. was that she worked as a clinical psychologist. Neither the state nor the trial court articulated in detail any reasons the state would wish to strike a clinical psychologist from this jury, although of course a venireperson's occupation may constitute a permissible race-neutral reason to strike, absent other indicia of discrimination. *See Porter*, 251 Ariz. 293, ¶ 16. The state argues that it was "unsurprising" that it "would exclude a clinical psychologist in a case in which the only viable defense is that the defendant either snapped or acted in self-defense due to past traumatic experiences." But this reasoning could apply similarly to the Caucasian therapist A.S.,

whom the state did not strike and who ultimately served on the jury. Compounding this evidence of potential pretext, the court had already precluded any evidence showing that Reaves suffers from post-traumatic stress disorder (PTSD) through rulings on the state's motions in limine.[2] In fact, earlier in the voir dire proceedings, the court had directly stated that "there's no issue about mental illness or anything like that in this case" while addressing another potential juror who ultimately did not serve on the jury. Under the totality of the circumstances, then, the record cannot support the court's unquestioning acceptance of the state's potentially pretextual motive for its strike of J.F.[3]

¶21 The state argues on appeal that the trial court's "simple conclusion that there was no purposeful discrimination and its denial of the *Batson* challenge were all that was required by Arizona and Federal law." For this assertion, the state cites extensively our supreme court's recent opinion in *Porter*, which held that trial courts are not required to "make express findings on the credibility of a demeanor-based justification for a peremptory strike when a non-demeanor-based justification is also offered and there is no evidence that either justification is pretextual."[4] 251 Ariz.

---

[2] Later, during trial, the court again denied Reaves's requests to introduce evidence showing that he suffers from PTSD, which makes him "hypervigilant" and "reactive." Evidence of a PTSD diagnosis is opinion testimony going toward proving mental defect, *State v. Jacobson*, 244 Ariz. 187, ¶ 20 (App. 2017), and it is generally inadmissible in Arizona for the purposes of proving an affirmative defense or to negate the *mens rea* element of a crime through a diminished-capacity defense, *State v. Malone*, 247 Ariz. 29, ¶¶ 8-9 (2019).

[3] During oral argument before this court, the state suggested a plausible distinction between the two mental health professionals. But any such distinctions were far from obvious and went wholly unexplored by the trial court—during a constitutionally required process that mandates a serious inquiry.

[4] As Reaves argues, this narrow holding in *Porter* does not squarely control the circumstances here. There, the prosecutor offered both a demeanor-based and a non-demeanor-based reason for its strike of a potential juror. 251 Ariz. 293, ¶ 2. Both reasons were race-neutral and not clearly pretextual, and the trial court explicitly deemed the non-demeanor-based reason to be credible. *Id.* ¶¶ 4, 25-26. Under those circumstances, our supreme court reasoned that no additional express findings were necessary regarding the demeanor-based justification

293, ¶¶ 1, 19.  Although Arizona trial courts are not always required to make express findings when ruling on a *Batson* challenge, it does not necessarily follow that our jurisprudence contemplates no circumstances whatsoever in which such findings are necessary.  To the contrary, our jurisprudence has not fully foreclosed the possibility that some circumstances might require express findings.  *See Porter*, 251 Ariz. 293, ¶ 1 (considering only whether trial court addressing *Batson* challenge "must make express findings on the credibility of a demeanor-based justification for a peremptory strike when a non-demeanor-based justification is also offered and there is no evidence that either justification is pretextual").

¶22 We conclude that more detailed findings at the third step of the *Batson* analysis were necessary under these circumstances, where Reaves timely raised non-frivolous evidence suggesting purposeful discrimination might have prompted the state's peremptory strike and the state was deprived of the opportunity to provide a facially race-neutral reason for making the strike.  *Cf. State v. Gay*, 214 Ariz. 214, ¶ 29 (App. 2007) (deferring to trial court's assessment of prosecutor's stated reasons for strikes, when record supported them).  Unlike other cases where express findings were unnecessary, the record here does not clearly support the trial court's conclusion that the strike was not pretextual.  *See Smith*, 250 Ariz. 69, ¶¶ 65, 68, 73 (relying on trial court's "specific findings as to each juror" in determining state's race-neutral reasons not pretextual, even while noting that "our precedent allows us to defer to" implicit findings).  Despite that, the trial court went no further than to "simply deem the State's explanations 'plausible,'" *id.* ¶ 73, without articulating why the state's given reason of J.F.'s mental health occupation was not pretextual.  Under these facts, Reaves raised a colorable inference that discrimination had infected the jury selection process sufficient to compel the court to explain, on the record, why it found no such discrimination had occurred.

¶23 To be clear, we do not conclude that Reaves has "proved discrimination."  *Johnson*, 545 U.S. at 169-70 (noting that, in *Batson*, trial court's actual error was "fail[ing] to demand an explanation from the prosecutor" after defendant made prima facie case that strike had discriminatory purpose).  Nor do we suggest the court was necessarily bound to overrule the state's strike, on this record.  Rather, we conclude

---

provided for the strike.  *Id.* ¶ 26.  Here, by contrast, the prosecutor provided a non-demeanor-based reason for his strike, and as we have discussed above, Reaves raised a non-frivolous inference that the reason given was potentially pretextual.

that under the totality of the circumstances here, where the court was confronted with "evidence tending to prove purposeful discrimination," *Miller-El*, 545 U.S. at 241, it was required to either seek further explanation from the prosecutor or explain on the record why it found no such additional explanation necessary.

¶24 Our state's jurisprudence affords trial courts much latitude to make implicit findings when ruling on *Batson* challenges. But we cannot condone a process so abbreviated that it renders the *Batson* process an empty ritual. Two additional features of the record support this conclusion.

¶25 First, the trial court itself supplied a neutral basis for the strike before the state could articulate one. This disabled a primary mechanism in the *Batson* process for deterring attorneys from exercising peremptory strikes in a racially discriminatory fashion: the knowledge that they will be called upon to provide a race-neutral basis for a strike and that their demeanor in doing so, and the plausibility of that basis, will be carefully assessed by the court. *See Snyder*, 552 U.S. at 477 ("best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge" (alteration in *Snyder*) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991))); *Medina*, 232 Ariz. 391, ¶ 44 (at *Batson*'s second step, "*prosecutor* must offer a race-neutral reason for each strike" (emphasis added)). Here, once the court volunteered a race-neutral basis for the strike, the prosecutor could infer that neither his demeanor nor the plausibility of that basis would face any critical assessment by the court.

¶26 Second, our record reflects that the trial court made a demeaning comment about the stricken psychologist as it denied the *Batson* challenge: the judge stated he was amused by J.F.'s reference to herself as a doctor. The psychologist's reference had not been proffered as a basis for striking her, and she holds a PhD in her field. The court's offhand remark could be read as both gratuitous and disrespectful. Notably, as a "[B]lack citizen," J.F. is among the very class of persons the *Batson* standard was designed to protect from discrimination. *Batson*, 476 U.S. at 85 ("Exclusion of [B]lack citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure."). The court's inappropriate remark does not provide us with confidence that it undertook the searching assessment the *Batson* standard compels. *See Johnson*, 545 U.S. at 172.

¶27 In so holding, we do not aim to extend our state's *Batson* jurisprudence beyond the reach our supreme court has already articulated in the opinions cited above. Rather, we underscore a consistent theme of

that jurisprudence, which has repeatedly exhorted trial courts to "bolster their rulings and facilitate review on appeal" when addressing *Batson* challenges. *Porter*, 251 Ariz. 293, ¶ 27. Our federal circuit has similarly requested or required such express findings in situations with a similar inference of discrimination. *See, e.g.*, *United States v. Alanis*, 335 F.3d 965, 968-69 & n.3 (9th Cir. 2003) (trial court must "evaluate meaningfully the persuasiveness of" state's explanation).

¶28 In sum, the trial court never allowed or required the prosecutor to provide its potentially race-neutral reasons for its strike of J.F., and consequently its finding of no discrimination was unsupported by the record. On remand, the trial court shall hold a hearing to allow the state to present evidence as to its race-neutral reasons for the strike, and it shall determine whether the prosecutor violated *Batson*. *See Batson*, 476 U.S. at 100 (remanding to require prosecutor to explain reasons underlying strikes if prima facie showing of discrimination established on remand); *see also Snyder*, 552 U.S. at 486 (leaving open possibility that motivation for peremptory strike might be "profitably explored further on remand" under different circumstances); *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (after trial court relied "on its own speculation as to" state's reasons for strikes, remanding for evidentiary hearing for state to "present evidence as to the prosecutor's race-neutral reasons" and allow court to determine whether *Batson* violation occurred); *State v. Urrea*, 244 Ariz. 443, ¶¶ 11-17 (2018) (acknowledging that federal jurisprudence recognizes variety of remedies following *Batson* error); *State v. Anaya*, 170 Ariz. 436, 441 (App. 1991) (remanding for trial court to attempt to reconstruct reasons underlying two peremptory challenges). If such a hearing cannot enable the trial court to make a sufficiently meaningful inquiry, the court must vacate Reaves's convictions and sentences and order a new trial.[5]

**Denial of Requested Jury Instructions**

¶29 Reaves also argues the trial court erred in denying him three requested jury instructions. We review a court's denial of requested jury instructions for abuse of discretion, *State v. Brock*, 248 Ariz. 583, ¶ 16 (App. 2020), and we review de novo whether the instruction correctly and adequately stated the law, *id.* ¶ 17. We "will not reverse a jury verdict based on an erroneous instruction unless the instructions, taken as a whole, could

---

[5]Because the trial court may make adequate findings on remand to support its denial of Reaves's *Batson* challenge, we address below the remainder of Reaves's claims of error.

reasonably mislead a jury." *Id.* "A party is entitled to an instruction on any theory reasonably supported by the evidence." *State v. Rodriguez*, 192 Ariz. 58, ¶ 16 (1998). However, a court is not bound to "give every specific instruction requested by the defense," so long as the "instructions adequately set forth the law applicable to the case," *id.*, "in understandable terms," *State v. Noriega*, 187 Ariz. 282, 284 (App. 1996).

**Burglary Instruction**

**¶30**      Reaves argues the trial court erred by refusing to instruct the jury that "a person cannot burglarize his or her own home," language taken from a comment to the Revised Arizona Jury Instructions (RAJI) Stat. Criminal 15.07 (second-degree burglary) (5th ed. 2019). Reaves sought this particular language because he presented evidence, primarily through his own testimony, that he considered the house his legal residence on the date of the killing. Specifically, Reaves testified that on the night of the killing, he let himself into the house using a spare key—one that A.T. did not know Reaves still possessed. He also testified that the week before the killing, A.T. had told him the house was "still [his] home." And during closing arguments, Reaves maintained the house was "his house," re-emphasizing the evidence supporting that claim. Reaves now argues the court's failure to give his requested instruction violated his constitutional rights to a fair trial, due process, and to present a complete defense.[6]

**¶31**      Rather than including Reaves's requested language that one cannot burglarize one's own home, the trial court instructed the jury that "[a] person who has an absolute and unlimited right to be in a dwelling cannot commit a burglary thereof." We identify no error in this instruction. Whereas Reaves's requested instruction reflected the comment to the RAJI, the final instruction directly quoted the case of origin for the RAJI comment. *See State v. Altamirano*, 166 Ariz. 432, 437 (App. 1990) (reversing burglary conviction when "defendant had an absolute and unconditional right to

---

[6]Reaves also argues this alleged error infected his conviction for first-degree murder. However, the jury found Reaves guilty of both premeditated murder under A.R.S. § 13-1105(A)(1) and felony murder under § 13-1105(A)(2). Because the jury's finding of guilt for premeditated murder did not require a conviction for burglary as an underlying offense, *see* § 13-1105(A)(1), any hypothetical error would be harmless as to Reaves's first-degree murder conviction. *See State v. Peraza*, 239 Ariz. 140, ¶ 22 (App. 2016) (erroneous jury instructions harmless if state can show beyond reasonable doubt that error did not affect verdict).

enter and remain on the property where he committed the crime"); *see also* RAJI Stat. Crim. 15-07.

¶32 Reaves presses that the trial court's instruction was "not adequate" because "the jury could have found" the residence was his home based on trial evidence that he considered the house to be his home. However, *Altamirano* did not hold that a defendant has an absolute and unlimited right to any dwelling he merely considers to be his legal residence, or his "own home." *See* 166 Ariz. at 437 (distinguishing cases upholding "convictions for burglary where the defendant had some legal or possessory interest in the residence"). Rather, *Altamirano* concluded only that a defendant cannot be convicted of burglary when he or she has "an unlimited right to be in the dwelling," such as in the defendant's "own residence." *Id.* at 435, 437. Importantly, it distinguished this conclusion from prior case law, particularly *State v. Van Dyke*, 127 Ariz. 335 (1980), which upheld a burglary conviction when the residence in question "primarily belonged to the victim" and the defendant had entered "with consent" but could claim "only limited possessory rights in the property." *Altamirano*, 166 Ariz. at 435. And, *Altamirano* expressly reasoned that even though *Van Dyke* was decided under an earlier version of the Arizona burglary statute, it "continue[d] to be viable" under the existing statute on elements specifically at issue here: (1) burglary does not require a defendant to break and enter "into the dwelling of another," and (2) burglary "emphasizes the subjective intent of the person who enters or remains unlawfully" in a structure. *Id.* at 434. Thus, *Altamirano* left undisturbed *Van Dyke*'s narrow holding that "a burglary charge can be maintained where entry is with consent and the defendant has only limited possessory rights in the property." *Id.* at 435.

¶33 *Van Dyke* offers a better parallel than *Altamirano*. The defendant in *Van Dyke* lived periodically with his "on-again, off-again" girlfriend and had been staying and sleeping away from the residence in question on the date of the burglary. 127 Ariz. at 336. Similarly, Reaves's testimony suggested that he previously resided at A.T.'s home and thought he might have a right to live there again, but had been living outside the residence for at least two weeks following a fight, had removed his items from the house, and had returned the only key the other occupants knew he possessed. Reaves's situation therefore resembles the *Van Dyke* defendant's circumstances: both defendants might have had some possessory interest in the residences in which they committed a felony, but neither lived in the residence at the time of the crime and neither had an absolute or unlimited right to remain in the dwelling in question. Thus, the instruction given here reflected the law applicable to the case. Finally,

neither RAJI instructions nor their comments constitute binding authority. *See State v. Logan*, 200 Ariz. 564, ¶ 12 (2001) (RAJIS not approved by our supreme court). We therefore identify no error in the court's refusal to give, verbatim, Reaves's requested instruction from the RAJI comment.

**Justification Instructions**

**¶34**　　　　Reaves also complains the trial court erred in refusing to provide the jury with defense-of-others and crime-prevention [7] jury instructions. A party is entitled to an instruction on any reasonably supported theory. *Rodriguez*, 192 Ariz. 58, ¶ 16. Only the "slightest evidence" is necessary to warrant a defendant's requested justification instruction. *State v. Almeida*, 238 Ariz. 77, ¶ 9 (App. 2015) (quoting *State v. King*, 225 Ariz. 87, ¶ 14 (2010)). This is a "low standard," and we construe the evidence in the light most favorable to the proponent of the instruction. *King*, 225 Ariz. 87, ¶¶ 13, 15. Under this standard, we do "not weigh the evidence or resolve conflicts in it," but rather we merely "decide[] whether the record provides evidence 'upon which the jury could rationally sustain the defense.'" *Almeida*, 238 Ariz. 77, ¶ 9 (quoting *State v. Strayhand*, 184 Ariz. 571, 588 (App. 1995)). Thus, although we typically review the denial of a jury instruction for abuse of discretion, we "independently assess whether the evidence supported a justification instruction, because that is a question of law and involves no discretionary factual determination." *Id.* ¶ 9.

**¶35**　　　　During trial, Reaves testified that he did not trust D.P., who had indicated he possessed firearms. Reaves also testified that several days before the killing, D.P. had threatened to kill him, his family, and "anybody

---

[7]The state argues Reaves forfeited and waived our review of the trial court's denial of this instruction. However, Reaves requested the instruction, and the court addressed its reason for denying it. Because the court had the opportunity to rule on the issue, we exercise our discretion to deem the issue preserved for purposes of this appeal. *See Banales v. Smith*, 200 Ariz. 419, ¶ 6 (App. 2001) ("party must have afforded the trial court and opposing counsel the opportunity to correct any asserted defects" to raise them on appeal). And because Reaves developed and supported this argument in his opening brief, he plainly did not waive the issue, either. *State v. Bolton*, 182 Ariz. 290, 298 (1995) (insufficient argument waives appellate review); *see also* Ariz. R. Crim. P. 31.10(a)(7) (opening briefs must contain argument with appropriate supporting citations to record and legal authorities).

it t[ook] to get" him.  Reaves indicated he was "concerned about the people at" A.T.'s house and that he considered D.P. to be a "dangerous person."

¶36        Reaves also testified that that when he observed A.T. and D.P. together through her bedroom window, he believed A.T. was going to "get herself hurt."  Nonetheless, he left A.T. and D.P. together, and he did not call law enforcement.  Instead, Reaves repeatedly called and texted A.T., accused her of having sex with D.P., and upon her confirmation that she had done so, Reaves told her he was going to kill D.P. and it would be her fault.  Reaves also told a gas station attendant he had caught his girlfriend cheating on him and that he wanted to damage her car.

¶37        Reaves entered A.T.'s house, carrying a metal bar, sometime after 1:30 a.m., at least three hours after initially leaving.  After grabbing the kitchen knives, Reaves walked into A.T.'s bedroom.  He testified D.P. was standing by the bed, and that he told D.P. to leave.  Reaves knew A.T. typically kept a loaded firearm near her, but he did not know where the firearm was, or whether D.P. had access to it.  Reaves said that he interpreted D.P.'s extension of his hand "as an attack," "just reacted," "snapped," and ducked below D.P.'s hand before stabbing him.  Reaves testified he was afraid D.P. was going to "try to trick [him] into something," that he believed D.P. was "a danger to the house," and that he "wanted to just defend [him]self."  He also repeatedly testified that he was acting at least partially in self defense.

¶38        The trial court provided the jury with Reaves's requested self-defense instruction, but refused to give his requested instructions regarding defense of third parties and crime prevention.  The court explained it did not believe the evidence supported either of these instructions.  Reaves argues he presented sufficient evidence to allow a jury to find he was acting in defense of others, thus warranting the instructions.

¶39        Reaves's requested crime-prevention instruction would have informed the jury that he was justified in acting with force "if and to the extent" he "reasonably believed that physical force or deadly physical force was immediately necessary to prevent another from committing or apparently committing . . . [b]urglary, sex assault, homicide, [or] any other felony of unlawful home entry with felony."  *See* A.R.S. § 13-411(A).  Under § 13-411, such force "can be used only to the extent it appears reasonable and immediately necessary to prevent commission of" any of the above crimes.

¶40        Reaves argues "the jury may have concluded his concerns after D.P. threatened to kill his family and anybody close to him were valid especially where [D.P.] told [Reaves] he had a gun." He maintains this case is similar to *Almeida*, where we held a crime-prevention instruction was required "because the evidence tended to suggest 'in the slightest degree' that [the defendant] was acting to prevent gun violence or yet another aggravated assault from being perpetrated by the victim during his ongoing episode of road rage." 238 Ariz. 77, ¶ 11 (quoting *State v. Johnson*, 108 Ariz. 42, 43 (1972)). However, the defendant in *Almeida* presented evidence that the victim had been driving aggressively, had waved a gun in the air, and had chased the defendant in his car, running red lights in the process. *Id.* ¶¶ 3-4. By contrast, Reaves presented no evidence that D.P. had taken any threatening action toward A.T., her housemates, or the general public, much less action that could be construed as imminently threatening. Rather, even read in the light most favorable to Reaves, his testimony established only that several days before the incident, D.P. had threatened to kill Reaves and any other unspecified individual who interfered with that outcome, that D.P. might have a firearm, and that D.P was in A.T.'s house, with her permission. This testimony does not provide even the slightest evidence that D.P. was committing, would imminently commit, or had committed any of the crimes enumerated in Reaves's requested instruction. *See id.* ¶ 9.

¶41        Further, these facts do not establish that D.P. presented an immediate risk to any individual other than, arguably, Reaves himself. Indeed, as noted above, Reaves testified that, after seeing D.P. in A.T.'s bedroom, he left the house, did not contact law enforcement to report D.P.'s threats, and returned hours later without any indication that D.P. had renewed his threats against Reaves or made any direct threats against A.T. or the house's occupants. Reaves's testimony did not contain even the slightest evidence that he reasonably believed D.P. presented an immediate threat to any third party. *Cf. King*, 225 Ariz. 87, ¶¶ 14-16 (evidence that defendant acted in response to being hit in head by water bottle thrown by victim sufficient evidence to warrant self-defense instruction); *State v. Lujan*, 136 Ariz. 102, 104 (1983) (collecting cases in which a victim's "hostile demonstrations" sufficed to support self-defense instruction). Thus, even observing the low threshold entitling a defendant to a defense justification, we see no error in the trial court's conclusion that the record did not support the crime-prevention instruction.

¶42        We similarly find no error in the trial court's refusal to provide a third-person-defense instruction. That instruction, as requested by Reaves, stated that he was justified in using physical force "in defense of

a third person" if both "[a] reasonable person in the situation would have believed that physical force was necessary to protect against" another's use, attempted use, or threatened use "of unlawful physical force against a third person" *and* that "[t]he defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the situation." *See* A.R.S. § 13-406; *see also* A.R.S. §§ 13-404, 13-405. In addition to the lack of evidence suggesting that any person other than Reaves was potentially in need of protection, the evidence also showed that Reaves exchanged a metal bar for kitchen knives before proceeding to stab D.P. seventeen times. Under these facts, no jury could rationally find that Reaves had used no more physical force than necessary in the situation. We thus also find no error in the court's refusal to provide the third-party-defense instruction.

**Premeditation Instruction**

¶43　　　　Reaves also argues the trial court erred by denying his requested instruction defining premeditation. Over Reaves's objection, the court instructed the jury as follows:

> Premeditation means the Defendant intended to kill another human being or knew that he would kill another human being, and after forming that intent or knowledge, reflected on the decision before killing. It's this reflection, regardless of the length of time in which it occurs, that distinguishes first-degree murder from second-degree murder.
>
> An act is not done with premeditation if it is in the instant effect of a sudden quarrel or heat of passion. The time needed for reflection is not necessarily prolonged and the space of time between the intent or knowledge to kill and the act of killing may be very short.

As he argued at trial, Reaves maintains the court should not have included the last sentence of the instruction regarding the length of time necessary to allow for premeditation. Reaves argues "no special facts" allowed the jury to receive the instruction that "the passage of time may be very short," and also that the court should have instructed the jury that the state had to "prove actual reflection." He also argues the court should have instructed the jury "the state had to prove actual reflection to prove premeditation."

18

And, he argues that the instruction's treatment of time "negated" his heat-of-passion defense.

¶44    We find no error in the instruction. Reaves correctly maintains that to prove premeditation, the state must go beyond merely proving time passed between the formation of an intent to kill and the act of killing. *See State v. Thompson*, 204 Ariz. 471, ¶¶ 27, 29, 31 (2004) (construing premeditation statute, A.R.S. § 13-1101(1), as requiring proof of reflection but allowing circumstantial evidence to constitute such proof). However, to accurately explain this law, the trial court was not required to give the instruction precisely as Reaves requested it. First, as we noted above, a defendant is not entitled to "every specific instruction" he or she requests. *Rodriguez*, 192 Ariz. 58, ¶ 16. Further, the court's instruction comported with the jury instruction recommend in *Thompson*, the prevailing case on this issue. Although *Thompson* concluded that a jury instruction that "proof of actual reflection is not required" was erroneous "without further clarification," it did not require courts to directly give the inverse instruction, that the state must prove actual reflection. 204 Ariz. 471, ¶¶ 32-34. Rather, *Thompson* provided a model instruction that conveys the legislature's intent for "premeditation, and the reflection that it requires, to mean more than the mere passage of time." *Id.* ¶¶ 27, 32. That model instruction explains to jurors that "reflection, regardless of the length of time in which it occurs," is what "distinguishes first degree murder from second degree murder." *Id.* ¶ 32. Thus, the *Thompson* instruction clearly requires the state to prove actual reflection to sustain a charge of first-degree murder.

¶45    Here, the trial court's instruction—taken nearly verbatim from the language suggested by *Thompson* and subsequently incorporated in our state's statutory criminal jury instructions—fully encompassed the principle that proof of reflection requires more than a mere showing that time passed. *See id.*; RAJI Stat. Crim. 11.05 (first-degree premeditated murder) (5th ed. 2019). And, although the state emphasized in its closing argument the amount of time that passed between when Reaves initially formed the intent to kill D.P. and when he actually stabbed D.P., it did not rely solely on the passage of time to prove the element of premeditation. Specifically, the state also presented evidence that Reaves reflected on his decision to kill D.P., including that he (1) told A.T. during a phone call that he was going to kill D.P., (2) exchanged his metal bar for kitchen knives upon entering A.T.'s house, and (3) upon entering, told A.T. to get her gun to kill him before he killed D.P., and then actually stabbed and killed D.P. Thus, the use of time here as one portion of the evidence offered to support an inference of premeditation is distinguishable from what *Thompson*

identified as impermissible use of time as a complete substitute for evidence of reflection. *See* 204 Ariz. 471, ¶¶ 29, 33. Similarly, the court's instruction correctly recited *Thompson*'s instruction that "[a]n act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion," *id.* ¶ 32, and the inclusion of this language did not prevent Reaves from arguing that he had "snapped" and was guilty only of second-degree murder.

¶46        We also find no error in the trial court's instruction that intent may be formed in a relatively short amount of time. Although the state presented evidence that Reaves may have formed an intent to kill well before entering A.T.'s house, other facts in evidence supported an inference that Reaves formed the intent to kill in a shorter amount of time. Specifically, the jury heard testimony that over the course of only a few minutes, Reaves "fl[ew] into the driveway" of A.T.'s house, stated he was going to kill D.P., picked up the kitchen knives, then entered the bedroom and stabbed D.P. repeatedly.

¶47        In any event, even had the inclusion of this sentence been erroneous, any hypothetical error would have been harmless. *See State v. Henderson*, 210 Ariz. 561, ¶ 18 (2005) (error harmless if state proves "beyond a reasonable doubt that the error did not contribute to or affect the verdict"); *see also Thompson*, 204 Ariz. 471, ¶ 34 (refusing to overturn conviction and sentence where beyond reasonable doubt that flawed jury instruction did not affect verdict). The state's proof of premeditation did not rely solely on the passage of time, and the remainder of the evidence supporting an inference of intent was sufficient for a reasonable juror to find, beyond a reasonable doubt, that Reaves reflected on his decision to kill D.P. before doing so.

## Preclusion of PTSD Evidence

¶48        Finally, Reaves argues the trial court erred when it denied him the opportunity to present "observation evidence" suggesting he suffers from PTSD, which he argues influenced his "reactiveness" to perceived threats to his and others' safety. In denying the admission of the proffered evidence, the court reasoned that prevailing case law prevented testimony that Reaves has PTSD without support for that evidence, such as expert testimony or diagnostic testing. It also reasoned that Reaves's assertion he suffers from PTSD could not be used as character trait evidence, because it could go only to a defense of diminished capacity or insanity. The court further reasoned that the evidence was "not relevant" and, even if it were, that its probative value was not outweighed by the

danger of unfair prejudice or confusion for the jury, such that it was precluded under Rule 403, Ariz. R. Evid. Reaves argues, as he did below, that preclusion of this evidence deprived him of his right to a defense, as protected by the Fifth and Sixth Amendments to the United States Constitution. Specifically, he argues the evidence was admissible insofar as it supported his theories that he acted either in the heat of passion or in self defense. He further argues that the court's ruling deprived him of his fundamental right to testify in his own defense.

¶49        We review for abuse of discretion a trial court's rulings on the admissibility of evidence. *State v. Davolt*, 207 Ariz. 191, ¶ 60 (2004). We review de novo questions of law. *State v. Leteve*, 237 Ariz. 516, ¶ 18 (2015). Because Reaves preserved this argument by raising it at trial, our review turns on whether any error occurred, and if so, whether it was harmless. *See id.*

¶50        We need only look to the latter requirement, however, because we agree with the state that any hypothetical error in the trial court's preclusion of the proffered testimony was surely harmless. Even had the court admitted Reaves's evidence that he suffers from PTSD, reactiveness, and hypervigilance, at best this evidence could only have served to rebut the element of premeditation in the first-degree murder conviction. But, as we outline above, the state's evidence supporting premeditation was overwhelming. *See id.* ¶ 26. Given the breadth of evidence supporting the jury's finding that Reaves reflected on the murder before committing it, the guilty verdict was surely unattributable to any claimed error in precluding evidence offered to support theories of non-premeditated homicide. *See id.* ¶ 25; *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).[8] Furthermore, the jury separately found Reaves guilty of both premeditated murder, as defined by A.R.S. § 13-1105(A)(1), and felony murder, as defined by § 13-1105(A)(2). Even were we to reverse Reaves's premeditated murder conviction, his first-degree murder conviction would stand as felony murder. *Cf. State v. Anderson*, 210 Ariz. 327, ¶ 59 (2005).

---

[8]The United States Supreme Court has not identified the improper restriction of a defendant's testimony as structural error putting it beyond the scope of harmless error review. *See Arizona v. Fulminante*, 499 U.S. 279, 309-12 (1991); *see also Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987) (recognizing that "the right to present relevant testimony is not without limitation").

**Disposition**

**¶51**      With respect to Reaves's claim of error pursuant to *Batson*, we remand to allow the trial court and the parties to augment the record to make detailed findings consistent with this opinion.  If, upon appropriate inquiry, the court concludes the strike injected impermissible discrimination into the jury selection process, the court must vacate Reaves's convictions and sentences and order a new trial.  With respect to Reaves's other claims of error, we affirm.